No. 97-240

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 113

294 Mont. 367

982 P.2d 421

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MARY KAY SPINA,

Defendant and Appellant.

No

APPEAL FROM: Youth Court and District Court of the Eighth Judicial District,

In and for the County of Cascade,

Honorable Thomas M. McKittrick, Judge Presiding (Youth Court).

COUNSEL OF RECORD:

For Appellant:

Kenneth R. Olson, Attorney at Law, Great Falls, Montana

For Respondent:

Honorable Joseph P. Mazurek, Attorney General; C. Mark Fowler,

Assistant Attorney General, Helena, Montana

Brant Light, County Attorney; Mike Rausch, Deputy County

Attorney, Bozeman, Montana

Submitted on Briefs: January 28, 1999

No

Decided: May 27, 1999

Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

**¶1. This case against Defendant, Mary Kay Spina (Spina), was transferred by the Youth Court to the Eighth Judicial District Court, Cascade County, where she was tried as an adult and convicted of negligent homicide in the shooting death of her father, Richard Spina. Spina appeals the Youth Court's waiver of its jurisdiction over her case and the resulting sentence imposed by the District Court. We affirm.**

<u>ISSUES</u>

**¶2. 1. Did the Youth Court err in waiving its jurisdiction over Spina and transferring her case to the District Court where she was tried as an adult?**

**¶3. 2. Do the transfer provisions of § 41-5-206, MCA (1995), violate Spina's right to equal protection under the law?**

**¶4. 3. Do the juvenile transfer procedures of the Montana Youth Court Act violate Spina's rights under Article II, Section 15, of the Montana Constitution?**

# BACKGROUND

**¶5. On April 25, 1996, Spina shot and killed her father inside the family's home on Malmstrom Air Force Base. At the time of the shooting Spina was fourteen years old. Earlier that evening, Spina's father had grounded her for coming home late. At approximately 11:15 p.m., Spina received a telephone call from her friend, Chris Cote. Spina told Cote she was upset with her father. She told him she was going to shoot her father with the 9 mm handgun she had under her pillow and then flee to New York to live with her brothers. Believing she was sincere and wanting to distract her from this course of action, Cote suggested that Spina meet him at a local hangout later that night, and she agreed.**

**¶6. Shortly thereafter, Spina descended the staircase of her home carrying a loaded 9 mm handgun in her pocket and various other items stowed inside a backpack. When Spina told her father she was leaving, he attempted to restrain her and an argument ensued. At some point during the course of this confrontation, Spina fired the gun, shooting her father in the abdomen. She then fled the house on foot.**

**¶7. Richard Spina placed a call to the county 911 dispatcher to request assistance, and two security officers from Malmstrom Air Force Base were dispatched to his house. Richard was conscious upon the officers' arrival and reported to them that he had been shot by his daughter.**

**¶8. After fleeing the residence, Spina ran to a nearby bowling alley. One of the bowling alley employees, Kenneth Cyr, noted that Spina was visibly upset and questioned her regarding the cause of her distress. Spina told him she had just shot her father. Cyr notified the police. He also took the 9 mm gun from Spina and placed it behind the reception counter. The police arrived, and Spina was taken into custody. Her father later died as a result of the gunshot wound.**

**¶9. Spina was charged before the Cascade County Youth Court with being a delinquent youth for the commission of the offense of deliberate homicide in the death of her father. Prior to her arraignment, the State filed a motion to have the case transferred from the juvenile court to the district court where Spina would be tried as an adult. The State also moved for a psychological evaluation of Spina by a court-appointed psychiatrist prior to the transfer hearing, and this motion was granted. After conducting an evidentiary hearing on the State's motion to transfer,**

the Youth Court waived its jurisdiction, and Spina's case was transferred to the District Court. In the District Court, Spina was tried by a jury and convicted of negligent homicide.

¶10. The District Court sentenced Spina to the Department of Corrections (DOC) for a term of twenty years. However, Spina's sentence was suspended upon condition that she enroll immediately in a residential therapeutic treatment facility at her own expense, as well as a number of other conditions. Spina appeals the transfer of her case by the Youth Court and the resulting sentence imposed by the District Court.

## DISCUSSION

¶11. 1. Did the Youth Court err in waiving its jurisdiction over Spina and transferring this case to the District Court where Spina was tried as an adult?

¶12. We review the transfer of a juvenile from the youth court to district court to determine whether the youth court abused its discretion. *Matter of J.K.C.* (1995), 270 Mont. 342, 344, 891 P.2d 1169, 1171. With regard to specific findings of fact relied on by the youth court in transferring the case, the standard of review is whether such findings are clearly erroneous. *Matter of J.D.W.* (1994), 267 Mont. 87, 91, 881 P.2d 1324, 1327. A finding is clearly erroneous where it is not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed. *Interstate Prod. Credit Ass'n v. De Saye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. We review a lower court's conclusions of law to determine whether its conclusions are correct. *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

¶13. The version of the Montana Youth Court Act in force at the time of Spina's transfer authorizes the youth court to transfer a juvenile to district court for prosecution if the youth is twelve or more years of age, the alleged conduct falls within one of several specified categories of offenses, including deliberate homicide as defined in § 45-5-102, MCA (1995), and the youth court finds, upon hearing all the relevant evidence, that there is probable cause to believe that:

(i) the youth committed the delinquent act alleged;

(ii) the seriousness of the offense and the protection of the community require treatment of the youth beyond that afforded by juvenile facilities; and

(iii) the alleged offense was committed in an aggressive, violent, or premeditated manner.

Section 41-5-206(1)(a) and (d), MCA (1995).

**¶14. In transferring a matter to district court, the youth court may also consider:**

(a) the sophistication and maturity of the youth, determined by consideration of the youth's home, environmental situation, and emotional attitude and pattern of living;

(b) the record of previous history of the youth, including previous contacts with youth court, law enforcement agencies, youth courts in other jurisdictions, prior periods of probation, and prior commitments to juvenile institutions. However, a lack of prior juvenile history with youth courts is not of itself grounds for denying the transfer.

Section 41-5-206(2), MCA (1995).

**¶15. As her initial argument, Spina contends that the factual findings relied upon by the Youth Court are clearly erroneous in that "[t]hey are not based on a 'serious consideration' of all the [statutory] criteria," but rather, are little more than a verbatim adoption of the proposed findings submitted by the State.**

**¶16. The State responds by pointing out that the record on appeal does not include a copy of the proposed findings of which Spina complains. The State argues that Spina violated Rule 9, M.R.App.P., by failing to give the State proper notice of her intention to raise this issue on appeal so that the relevant parts of the Youth Court record could be retrieved and included in the record on appeal. The State also argues that Spina's brief violates Rules 23(4) and 23(6)(e), M.R.App.P., because she fails to cite to those portions of the record which support her argument.**

**¶17. We agree that Spina's assertion that the Youth Court adopted its findings verbatim from the State's proposed findings cannot be verified from the record before us. It is axiomatic that this Court will not consider evidence not contained in**

the record on appeal, and a party's reference to evidence does not incorporate that evidence into the record. *Johnson v. Killingsworth* (1995), 271 Mont. 1, 3, 894 P.2d 272, 273. We therefore decline to address the question of whether the Youth Court's findings are clearly erroneous as a result of the verbatim adoption of those findings from the proposed findings of fact and conclusions of law submitted by the State at the transfer hearing.

¶18. Spina also contends that several of the Youth Court's findings of fact and conclusions of law are erroneous in that they do not accurately reflect the evidence presented at the transfer hearing. Specifically, Spina contends that the Youth Court's Finding of Fact Nos. 2, 3, 4, 5, 6, 7, 14, 15, 16, 17 and 19 and Conclusion of Law Nos. 4, 5, 15, 20, 21, 22, 24, 26, 27, and 28 are erroneous. We address each of Spina's contentions in turn.

Finding of Fact No. 2

¶19. Finding of Fact No. 2 was written by the Youth Court as a narrative description of the events which occurred on April 25, 1996, relative to the shooting death of Richard Spina. Spina does not contest any of the findings contained in the Youth Court's narrative. Rather, she contends that Fact No. 2 is clearly erroneous in that it omits important facts which "present[] a much different view of [Spina] than that of the cold-blooded psychopath." More particularly, Spina argues that the court's findings fail to refer to the testimony of Ken Cyr and Cascade County Deputy Sheriffs St. Onge, Dalke and Antonich regarding Spina's appearance of remorse and concern for her father shortly after the shooting.

¶20. The testimony of Ken Cyr which Spina contends should have been relied on and included in the Youth Court's determination of Finding of Fact No. 2 is as follows:

Q: Did she express concern about her dad?

A: Yes.

Q: And in fact, you said in your statement at the end that "She expressed remorse and concern that she may have killed her father as we talked." That's what you wrote down?

A: Yes.

Q: And this was moments after it had occurred, the incident had occurred, or a short while after it had occurred, she was meeting with you?

A: That comment that I got from her mostly came I would say right before the deputies came and while they were there. And I remember asking one of the deputies, "Is there some way we can find out the condition of her father, because I think if she knew how he was she would be able to talk with us more."

. . .

Q: She didn't appear happy about the fact that --

A: No.

Q: -- that this occurred?

A: Oh, no.

Q: She didn't appear to be coldhearted about it or uncaring about it?

A: I didn't think so at all.

Q: And you thought she was expressing genuine remorse and concern about what had occurred?

A: Yes.

**¶21. The testimony given by Officer St. Onge that Spina contends was disregarded by the Youth Court in its Finding of Fact No. 2 is as follows:**

A: At that time I asked her if she was all right. And she stated, "Is my father still alive?" At which time I told her that he was conscious when we loaded him into the ambulance and that's all I knew.

. . .

Q: My understanding of the first words that she spoke to you was she asked you about her dad and the condition of her dad?

A: That's correct.

Q: That was the first words out of her mouth, at least to you?

A: Right. When I asked her if she was all right.

Q: Did she appear to be concerned about the condition of her dad?

A: Well, she was crying and that. And she asked if he was still alive. But that's basically it.

. . .

Q: Mr. Cyr indicated that he thought she was remorseful and concerned about the condition of her dad. Would you agree or disagree with that?

A: All I know is she just asked the one time about her father in my presence.

**¶22. The testimony given by Officer Dalke with regard to her impression of whether Spina expressed remorse or concern over the condition of her father is as follows:**

Q: Did she ask about her dad?

A: She didn't ask me about her father, no.

Q: Did you hear her ask anyone else?

A: Not that I believe.

**¶23. The testimony of Officer Antonich with regard to his first interview with Spina included the following:**

Q: Did you attempt to find out what the problem was?

A: Yes. I asked her what happened.

Q: What did she respond to you?

A: She told me that she had shot her dad.

Q: Did she tell you anything else?

A: Let me look here. She stated that she hated him. And she kept asking if he was dead.

**¶24. We disagree with Spina's contention that Finding of Fact No. 2 is clearly erroneous in that it "ignores" the "important evidence" presented by these witnesses. Our review of the record reveals conflicting evidence regarding whether Spina expressed remorse and concern for her father upon her apprehension by law enforcement officials. It is within the domain of the trial court to resolve conflicts in the evidence based on its assessment of the demeanor and credibility of the witnesses before it, and this Court will not resolve such conflicts on appeal.** *Matter of T.N.* **(1994), 267 Mont. 81, 85, 881 P.2d 1329, 1332. We therefore conclude that the Youth Court's Finding of Fact No. 2 is not clearly erroneous.**

Finding of Fact No. 3

**¶25. In Finding of Fact No. 3 the Youth Court found that Spina had planned the confrontation which ultimately led to her father's death. Spina argues that this conclusion is inconsistent with the evidence and fails to address facts indicating the shooting was an accident, or alternatively, was performed by Spina in self-defense. The evidence to which Spina refers includes testimony by Spina and her mother that Spina's father had verbally abused Spina in the past and had hit Spina on four or five prior occasions; the testimony of Spina's mother that Spina would have been scared of a confrontation with her father; the testimony of an expert in clinical psychology that in normal instances of patricide by an abused child, the child "sneaks up" on the parent rather than confronting the abuser directly and that, in his opinion, Spina is extremely impulsive and incapable of long-term planning of such a confrontation; and Spina's statements to clinical evaluators that the shooting was an accident.**

**¶26. We hold that there is sufficient evidence in the record to support the Youth Court's finding that Spina's confrontation with her father was planned. It was the testimony of Chris Cote that at approximately 11:15 p.m. on the night of the**

shooting, Spina told Chris she was upset with her father because he had grounded her and that she was going to shoot him so she would not have to put up with him anymore.

¶27. Additionally, the clinical psychologist who testified that, in his opinion, Spina was incapable of long-term planning for such a confrontation also testified that Spina knew a confrontation with her father could have been avoided by leaving directly from school the following morning, but that instead she chose to force a confrontation with her father that evening.

¶28. Moreover, a memo book found in Spina's backpack on the night of the shooting contained a listing of items Spina intended to take with her when she left home. This list included a 9 mm handgun, money, checks, "a big ass knife," condoms, credit cards and plane tickets. The memo stated that she wished to "get away from it all" and that her final destination would be New York. The memo also stated that Spina "might - kill someone."

¶29. Finally, the evidence in the record shows that sometime prior to the events of April 25, 1996, Spina had retrieved a loaded 9 mm handgun from her father's bedroom and hid it under her pillow. Before descending the stairs to leave the house that night, Spina cocked the gun and placed the weapon in her pocket.

¶30. Again, it is the duty of the trier of fact to resolve any conflicts in the evidence before it, and this Court will not reweigh evidence on appeal. *T.N.*, 267 Mont. at 85, 881 P.2d at 1332. Despite the evidence which Spina cites to the contrary, there is sufficient credible evidence in the record to support the Youth Court's finding that Spina planned the confrontation which ultimately led to her father's death. Moreover, we conclude that the Youth Court did not misconstrue the effect of the evidence before it in failing to find that the shooting was accidental or performed in self-defense, as Spina asserts. We therefore hold that Finding of Fact No. 3 is not clearly erroneous.

Finding of Fact No. 4

¶31. Finding of Fact No. 4 by the Youth Court reads as follows:

The Youth made several statements to Dr. Scolatti which are noted in his report. These

statements indicate planning, premeditation, and deliberation. They indicate that the motive was because her father got in her way.

**¶32. Spina argues that Finding of Fact No. 4 is erroneous for a number of reasons. First, Spina contends that this Court "is left to guess as to which statements, attributed to Dr. Scolatti, the court is referring;" and second, she contends that Dr. Scolatti's report does not support the Youth Court's conclusions regarding Spina's motive.**

**¶33. With regard to Spina's argument that Dr. Scolatti's report does not contain any statements made by her which indicate planning, premeditation and deliberation, the following dialogue is quoted from Dr. Scolatti's report:**

Scolatti: Why didn't you just wait until your dad slept to get out of the house?

Spina: I don't know. I just wanted to leave then.

Scolatti: Why did you feel you needed a gun?

Spina: Because he wouldn't let me leave.

Scolatti: Why not just wait until the morning and then take off from school?

Spina: I wanted to leave now. I thought about it, but I just had to leave now.

Scolatti: Why did you just have to leave now?

Spina: I felt scared, I don't know why, I was just scared.

Scolatti: What were you afraid of?

Spina: I don't know, like I said, just everything came back, I don't know.

Scolatti: When did you cock the gun?

Spina: In my room, when I was packing.

¶34. **The Youth Court determined that the statements made by Spina in the course of her evaluation by Dr. Scolatti indicated Spina acted with planning, premeditation, and deliberation during the events preceding the shooting death of her father. We conclude that there is substantial evidence in the record to support such a conclusion and that this finding is not otherwise clearly erroneous.**

¶35. **With regard to Spina's contention that Dr. Scolatti's report does not support the Youth Court's finding regarding Spina's motive in shooting her father, we note that the court's conclusion that Spina killed her father because he "got in her way" more closely mirrors the conclusions of Dr. Mendenhall, the court-appointed psychiatrist, who reported as follows:**

I believe that she killed Richard Spina because he was no longer useful to her; that he had become a net detriment rather than a net advantage. I believe that this is consistent with her overall personality structure, and I believe that she is dangerous for this reason.

However, in answering one of the questions referred to him by Spina's attorney, Dr. Scolatti also addressed the issue of Spina's intent on the evening of April 25, 1996:

3. Did Ms. Spina have the capacity to act knowingly and purposely at the time of the offense?

Yes. Ms. Spina was aware of the gun and her stated purpose was to threaten her father with it in order to leave the house[.]

¶36. **Without addressing whether the Youth Court's findings regarding Spina's purpose for confronting and ultimately shooting her father are best attributed to the conclusions of Dr. Mendenhall or the conclusions of Dr. Scolatti, we hold that there is substantial credible evidence in the record to support the finding that Spina acted in a premeditated manner during the commission of the offense and that Finding of Fact No. 4 is not otherwise clearly erroneous.**

Finding of Fact No. 5

¶37. In Finding of Fact No. 5 the Youth Court stated that it "considered the sophistication and maturity of the Youth as determined by consideration of the Youth's home, environmental situation, emotional attitude and pattern of living." The court then went on to find that Spina's home environment had been "good enough" to foster normal child development; that Spina had not suffered from sexual abuse; that the physical abuse to which Spina had been subjected was limited to four or five occasions of being hit, but that no abuse had occurred within the year preceding the shooting; that Richard Spina had loved and supported his daughter and had set usual disciplinary limits regarding homework, curfew, house chores, etc.; that Spina had suffered from sporadic verbal abuse by her father; that both Spina and her mother admitted Spina was generally "spoiled" and received most of the things she wanted; that Spina's father and mother had engaged in verbal fights and that the primary stress factor in the family had been financial; that Spina's mother had been absent from the family while working in Alabama to earn a greater income and had been delayed in her return to the family; that Spina's environment had included other family, friends, and social activities; that Spina had demonstrated an average academic performance; that since her arrest, Spina's record of behavior at the juvenile detention center had not been exemplary; and finally, that Spina's family history did not reflect the pattern of egregious abuse normally found in severely disordered children.

¶38. Spina argues that Finding of Fact No. 5 is clearly erroneous in that it ignores the unanimous opinion of the psychological experts in this case that Spina is not very mature or sophisticated and that she should not be incarcerated in an adult facility for that reason; it ignores the testimony of a DOC juvenile parole officer that in at least one other instance, a female juvenile offender who was tried as an adult was sentenced to the women's correctional facility upon conviction; it ignores the fact that Spina did not possess the same level of prior criminal and clinical history as the other female juvenile offender sentenced to the women's correctional facility; and it ignores the testimony of Spina's teachers, friends and neighbors that prior to shooting her father, Spina was a normal fourteen year old girl with normal social contacts and no history of abusive or disruptive behavior.

¶39. As an initial matter, we note that § 41-5-206(2), MCA (1995), permits, but does not require, consideration of a youth's maturity and sophistication in determining whether to transfer a juvenile to district court. Although the Youth Court indicated in its order that it had considered Spina's sophistication and maturity as determined

by what it found to be the condition of Spina's home and social environment, Finding of Fact No. 5 does not expressly state any findings by the Youth Court with regard to Spina's level of maturity or sophistication.

¶40. Our review of the record demonstrates that insofar as the individual findings contained in Finding of Fact No. 5 relate to Spina's home and social environments, these findings are supported by substantial credible evidence and are not otherwise clearly erroneous. We further hold that the Youth Court's failure to specifically set forth findings regarding Spina's level of maturity or sophistication does not constitute reversible error under the plain language of § 41-5-206(2), MCA (1995).

¶41. With regard to whether the Youth Court erred in ignoring evidence of the prior prosecution and incarceration of another female juvenile offender who was sentenced to the women's correctional facility, we hold that this evidence was not pertinent to a discussion of either Spina's level of maturity or the condition of her home and social environments and so was properly disregarded by the Youth Court in Finding of Fact No. 5.

Finding of Fact Nos. 6 and 7

¶42. In Finding of Fact Nos. 6 and 7, the Youth Court stated its findings regarding Spina's emotional and mental health based on the psychological evaluations of Drs. Mendenhall and Scolatti. In its findings, the Youth Court accepted the diagnosis and recommendations of these experts and determined that the evaluations were substantially consistent with one another. The Youth Court found that both evaluators had noted Spina's lack of affect in discussing the death of her father; both had noted her lack of insight into her behavior and its consequences; and both evaluators had concluded that Spina constituted a danger to her community. Both evaluators had also opined that there was some probability of reoffense; however, while Dr. Mendenhall's prediction of reoffense was certain, Dr. Scolatti declined to put a quantitative figure on that probability. The court also found that both evaluators had observed behaviors consistent with a borderline personality disorder, although each agreed that a definitive diagnosis of such a disorder could not be made at that time due to Spina's adolescence.

¶43. Spina disputes the Youth Court's finding that the diagnoses and recommendations of these evaluators were consistent, asserting that such a finding is

"patently erroneous." Spina contends that Dr. Scolatti's evaluation differed substantially from that of Dr. Mendenhall on a number of issues, including the severity of Spina's conduct disorder, her treatability, recommendations as to placement, and whether a provisional diagnosis of borderline personality disorder is appropriate in an adolescent patient.

¶44. Our review of the record reveals that although the diagnoses and recommendations of these experts were not identical, the court's characterization of the evaluations as consistent is not "patently erroneous" as Spina contends. The record plainly supports the finding that both professionals diagnosed Spina with a conduct disorder. The record also plainly supports the finding that both evaluators noted symptomatology indicative of a borderline personality disorder, although both experts prefaced their conclusions with a caveat that such a diagnosis would not be appropriate in the case of a child under eighteen. The record also reflects the recommendation of both professionals that Spina receive treatment in a secure setting for a number of years, followed by continued supervision on an outpatient basis. Neither expert recommended incarceration in an adult penal institution as an ideal placement, and yet both evaluators expressed concern over the limited duration of a secure placement within the juvenile system.

¶45. Because there is substantial credible evidence in the record to support the Youth Court's findings and these findings are not otherwise clearly erroneous, we will not disturb Finding of Fact Nos. 6 and 7.

Finding of Fact No. 14

¶46. In Finding of Fact No. 14, the Youth Court found that Spina had no prior arrest record, but that she had self-reported to the mental health professionals in this case several misdemeanor thefts. The Youth Court also found that Spina had once run away from home and that she had been investigated in 1996 in relation to a misdemeanor theft from a neighbor's home. Spina contends that while these findings are facially correct, they are nevertheless clearly erroneous in that they constitute a disingenuous attempt by the Youth Court to assign her with criminality which she does not possess.

¶47. Because Spina does not contest the accuracy of the findings made by the Youth Court, and our review of the record reveals that the findings regarding Spina's

admission of prior transgressions are not clearly erroneous, we will not disturb the Youth Court's Finding of Fact No. 14.

Finding of Fact No. 15

¶48. In Finding of Fact No. 15, the Youth Court found, in accordance with the testimony of Dick Boutilier, chief juvenile probation officer for the Eighth Judicial District, that if Spina were tried in the juvenile system and committed to the custody of the DOC, the DOC would attempt to place her in a secure therapeutic setting. Also in accordance with the testimony of Boutilier, the Youth Court found that there are two out-of-state facilities with whom the State could contract for secure therapeutic placement for Spina, but that the DOC could not guarantee that if Spina were committed to its custody as a juvenile offender, it would place her in either of these facilities, or that the length of stay in either institution would be adequate to successfully rehabilitate her.

¶49. Spina contends that these findings are erroneous in that they fail to include portions of Boutilier's testimony in which he stated that there are more treatment options available in the juvenile system than in the adult system, that he had some concern regarding Spina's incarceration in an adult facility; that if Spina were convicted as an adult and sentenced to the custody of the DOC, they would likely place her in the women's correctional facility; and that at least one of the contract facilities for female juvenile offenders had already been contacted and indicated they would be willing to accept Spina into their program if she were convicted as a juvenile. Moreover, Spina contends that although it was the recommendation of Boutilier that Spina be tried as an adult, this recommendation was based upon the conclusions contained in Dr. Mendenhall's report, which "are, for the most part, wrong."

¶50. Essentially, Spina argues that the Youth Court erred in setting forth and relying on certain portions of a witness's testimony, but not others. We find this argument unpersuasive. A trial court need not recount with exacting specificity every aspect of a witness's testimony before it may rely upon that testimony in its findings. Spina cites no authority to support her position, and we decline to adopt such reasoning here. For these reasons, we affirm Finding of Fact No. 15.

Finding of Fact No. 16

¶51. In Finding of Fact No. 16, the Youth Court, in accordance with the testimony of Dave Peterson, a juvenile parole officer for Region III, found that if Spina were convicted as a juvenile, the most time she would spend in a secure therapeutic setting would be eighteen months, after which time she would be moved into a less restrictive environment and possibly even home. Also in accordance with Peterson's testimony, the Youth Court found that the State of Montana has a total of ten juvenile parole officers, only two of which serve the seventeen county region in which Spina would be paroled after her secure placement terminated. It was Peterson's testimony, and the Youth Court so found, that DOC does not have the resources to adequately supervise a youth such as Spina if she were paroled.

¶52. Additionally, the Youth Court found, based on Peterson's testimony, that because there are no correctional facilities for female juveniles in Montana, the DOC must contract for secure placement of female juveniles at out-of-state facilities. However, because these facilities are privately owned, they may decline to enroll candidates who fail to meet their admission criteria and may remove a candidate at any time for noncompliance with program guidelines.

¶53. Spina contends that these findings are erroneous in that they fail to include portions of Peterson's testimony in which he stated that because of the seriousness of Spina's offense, the DOC would prioritize funding for her and attempt to place her in a secure therapeutic setting if she were convicted as a juvenile. Peterson also testified that if Spina were placed on parole within his region, he would do his best to supervise her appropriately.

¶54. Again, Spina bases her contention with regard to Finding of Fact No. 16 on the argument that the Youth Court erred in setting forth certain portions of a witness's testimony, but not others. For the same reasons cited above in Finding of Fact No. 15, we reject this argument and affirm Finding of Fact No. 16.

Finding of Fact No. 17

¶55. In Finding of Fact No. 17, the Youth Court found, based on the testimony of John Paradise, the juvenile residential unit manager for DOC, that 80 percent of the annual $862,000 residential placement budget for Region III had already been allocated on current shelter and foster care placements by the time of Spina's transfer hearing in July 1996. As a result, the DOC had less than $200,000 in its

budget to cover the cost of all new placements in 1996.

¶56. Spina contends that Finding of Fact No. 17 is clearly erroneous, not because of what is contained in the finding, but because of what is omitted. More specifically, Spina argues that the Youth Court failed to include portions of Paradise's testimony regarding the likelihood that Spina would be placed in the women's correctional facility if she were tried as an adult, the greater variety of treatment options available to Spina in the juvenile system, and the priority of funding Spina would receive from the DOC if she were to remain in the juvenile system.

¶57. We hold that the Youth Court's findings regarding the fiscal status of DOC's juvenile residential placement budget for 1996 are not clearly erroneous as a result of the Youth Court's failure to include additional portions of Paradise's testimony in the court's findings. For the reasons stated above in Finding of Fact Nos. 15 and 16, we affirm the Youth Court's Finding of Fact No. 17.

Finding of Fact No. 19

¶58. In Finding of Fact No. 19, the Youth Court found that if Spina were convicted as an adult, the DOC would have the option of contracting for her placement at a secure, therapeutic juvenile facility during the remainder of her minority. Spina contends this finding is erroneous, because "[w]hile this statement may be true," the testimony of four DOC officers was that, if convicted as an adult, Spina would be placed directly in the women's correctional facility and not in a juvenile facility.

¶59. We find no error in the Youth Court's Finding of Fact No. 19, in part because Spina herself concedes that the finding is facially accurate, and also because the findings which Spina argues the Youth Court erroneously omitted from Finding of Fact No. 19 were effectively set forth in Finding of Fact No. 18, which reads: "DOC has an oral policy of sending juvenile females who are transferred to adult courts to the Women's Correctional Center in Billings." For these reasons, we affirm Finding of Fact No. 19.

Conclusion of Law No. 4

¶60. In Conclusion of Law No. 4 the Youth Court concluded that there was probable cause to believe that Spina committed the offense of felony deliberate homicide.

Spina argues that "[w]hile that conclusion is, arguably, supported by the evidence, it ignores certain very important evidence." The evidence which Spina contends was ignored by the Youth Court included Spina's own testimony that the shooting was an accident, the testimony of Spina's mother that Spina was very scared of her father when he was angry, and the conclusions of Dr. Scolatti that the emotional abuse by Spina's father is a mitigating factor in this instance.

¶61. In concluding that there was probable cause to believe that Spina committed the offense of felony deliberate homicide, the Youth Court relied upon the underlying finding that the shooting was not accidental. Our review of the record reveals conflicting evidence on the issue of whether the shooting was deliberate or accidental. It was the duty of the Youth Court to resolve those conflicts, and we will not reweigh this evidence on appeal. *Matter of T.N.*, 267 Mont. at 85, 881 P.2d at 1332. Because there is substantial credible evidence to support the Youth Court's finding, and the finding is not otherwise clearly erroneous, we will not disturb this finding on appeal. Additionally, because the findings upon which the Youth Court relied in reaching its conclusion were not clearly erroneous, we affirm the court's conclusion that probable cause existed to believe that Spina had committed the offense of deliberate homicide.

Conclusion of Law No. 5

¶62. In Conclusion of Law No. 5, the Youth Court concluded that the offense against Richard Spina was committed in an aggressive, violent, and premeditated manner as demonstrated by Finding of Fact Nos. 2, 3, and 4. Spina contends that Conclusion of Law No. 5 is erroneous because it states that the offense was committed in an aggressive, violent and premeditated manner, rather than there was probable cause to believe the offense was committed in an aggressive, violent and premeditated manner. Additionally, Spina argues that the conclusion ignores evidence indicating the shooting occurred spontaneously during Spina's attempt to leave the house.

¶63. We have already concluded that Finding of Fact Nos. 2, 3, and 4, upon which the Youth Court relied in reaching Conclusion of Law No. 5, are not clearly erroneous. Moreover, we hold that the Youth Court's conclusion that the offense was committed in an aggressive, violent and premeditated manner satisfies the statutory requirement that the court find there was probable cause to believe the offense was committed in an aggressive, violent and premeditated manner. We therefore affirm Conclusion of Law No. 5.

Conclusion of Law No. 15

**¶64. In Conclusion of Law No. 15, the Youth Court concluded that the DOC cannot place a juvenile in an out-of-state correctional facility until funding for such a placement has been secured and the youth has been screened for that facility's admission criteria. Spina argues that these requirements were met in her case because the DOC juvenile residential placement manager testified that the DOC would prioritize funding for Spina if she were convicted as a juvenile and that at least one out-of-state placement facility had already screened and accepted her for admission.**

**¶65. Although Spina contends that she satisfied the requirements for out-of-state placement, she does not contest the Youth Court's conclusion with regard to what those requirements were. We find no error in Conclusion of Law No. 15 with regard to the need for the DOC to secure funding and facilitate admission screening of a youth prior to contracting for secure placement out of state.**

Conclusion of Law Nos. 20, 22 and 24

**¶66. In its transfer order, the Youth Court concluded that transferring Spina into the adult system neither mandated incarceration nor precluded rehabilitation, and that while any commitment of Spina must necessarily be to the custody of the DOC, the DOC was not bound to incarcerate her. Spina concedes these conclusions are "technically true" and "theoretically correct" but argues that they are nevertheless "factually erroneous" based on the testimony of DOC officials that if Spina were sentenced to the custody of the DOC as an adult, she would likely be incarcerated at the women's correctional facility.**

**¶67. The adult sentencing guidelines set forth in § 46-18-201, MCA (1995), provide a district court with a number of sentencing options, including the imposition of a deferred or suspended sentence with various conditions of probation. The Youth Court was therefore correct in concluding that upon being tried and convicted as an adult, Spina's incarceration would not be mandatory under the laws of Montana.**

**¶68. Additionally, even if a youth were sentenced to a term of commitment by the district court and thereby placed into the custody of the DOC under § 41-5-206(8), MCA (1995), the DOC is not required to incarcerate the youth, but shall "confine the**

youth in whatever institution that it considers proper, including a state youth correctional facility." This broad grant of discretionary placement power with the DOC allows for the possibility that even if she were convicted and sentenced as an adult, Spina could be placed in an in-state residential treatment facility or placed at an out-of-state secure juvenile facility at least during the remainder of her minority.

¶69. Despite the testimony of DOC officials regarding the likelihood of Spina being immediately placed at the women's correctional facility following her conviction as an adult, the law does not require such a result. As we stated in *Matter of T.N.*, "[t]he fact that this action is being sent to the criminal justice system does not preclude rehabilitation and mandate incarceration. The court has other options available to it should [the youth] be found guilty of this crime." *T.N.,* 267 Mont. at 86, 881 P.2d at 1333. For this reason, we affirm Conclusion of Law Nos. 20, 22 and 24 that Spina's transfer neither mandated incarceration nor precluded rehabilitation.

Conclusion of Law No. 21

¶70. In Conclusion of Law No. 21, the Youth Court concluded that the adult sentencing policies set forth in § 46-18-101, MCA (1995), are similar to the sentencing purposes of the Youth Court Act in that both statutes are designed to ensure rehabilitation, accountability and protection of the community. Spina argues that this constitutes a misstatement of the law because the declaration of purpose set forth in the Youth Court Act does not promote "accountability."

¶71. One of the express legislative purposes of the Youth Court Act is to reduce delinquency through the use of immediate, consistent, enforceable and avoidable consequences for delinquent behavior. Section 41-5-102(2), MCA (1995). The act also recognizes the need for restitution by a delinquent juvenile in some cases. Section 41-5-102(2), MCA (1995). The adult correctional policy of the State of Montana is set forth in § 46-18-101(2), MCA (1995), which reads in pertinent part:

The correctional policy of the State of Montana is to protect society by preventing crime through punishment and rehabilitation of the convicted. The legislature finds that an individual is responsible for and must be held accountable for the individual's actions, including, whenever possible, the restoration of all pecuniary losses sustained by the victim of the offense. Corrections laws and programs must be implemented to impress upon each individual the responsibility for obeying the law. To this end, it is the policy of

the state to assure that prosecution of criminal offenses occurs whenever probable cause exists and that punishment of the convicted is certain, timely, and consistent.

**¶72. We hold that the Youth Court did not err in concluding that, although not identical, the Youth Court Act and the adult sentencing statutes have the similar purposes of ensuring the safety of the community through the prevention of crime, rehabilitating individual offenders and, when appropriate, holding individuals accountable for their actions through the imposition of restitutionary measures. We therefore affirm Conclusion of Law No. 21. Conclusion of Law Nos. 26 and 27**

**¶73. In Conclusion of Law Nos. 26 and 27, the Youth Court concluded that Spina was in need of long-term therapeutic care beyond the age of nineteen and that the juvenile system in Montana was woefully inadequate for the treatment of Spina given the seriousness of her offense and the need to protect the community.**

**¶74. Spina argues that the conclusion that she is in need of secure care beyond age nineteen is erroneous because it is speculative and contrary to the opinions given by the mental health experts in this case. Additionally, Spina argues, the Youth Court ignored evidence which militates against such a conclusion, including her lack of a prior criminal record, her strong family support, the low rate of recidivism in cases of family homicide, and the notable improvement in her behavior at the juvenile detention center since she began receiving "critical incident stress" counseling from Dr. William Taylor.**

**¶75. As an initial matter, we note that any prediction as to how long a youth may be in need of a particular form of care is necessarily speculative. However, the nature of the transfer proceedings dictate that such a prediction be attempted. It was the responsibility of the Youth Court to determine, based on all relevant information available at the time, what Spina's future treatment needs were likely to be, and we will not disturb the conclusions of that court on the grounds that such a prediction cannot be made with mathematical certainty. Moreover, we disagree with Spina's assertion that the Youth Court's conclusion regarding Spina's length of treatment was contrary to the opinions of the mental health experts in this case.**

**¶76. Dr. Scolatti testified that, in his opinion, Spina would require one to two years of secure therapeutic treatment, followed by continuing outpatient treatment for at**

least two more years, provided that her initial inpatient treatment was successful. Dr. Scolatti expressed concern that if Spina remained in the juvenile system and was not successful in her treatment by age nineteen, she would nevertheless be released back into the community where there were not sufficient resources to supervise her adequately. In any event, Dr. Scolatti recommended that Spina remain under court supervision until at least age twenty-five.

¶77. Dr. Mendenhall testified that, in his opinion, Spina would require secure care in a structured environment beyond the age of nineteen. Dr. Mendenhall also opined that two years of outpatient treatment and supervision after release from secure care at the age of nineteen would be insufficient to meet Spina's treatment needs. For this reason, Dr. Mendenhall testified that the safety of the community necessitated Spina's transfer out of the juvenile system.

¶78. Spina also argues that the juvenile system in Montana is not woefully inadequate to meet her treatment needs, but rather the State simply did not want to incur the expense of placing her at a secure out-of-state juvenile facility. Such a conclusion is not supported by the record.

¶79. None of the DOC officials who testified indicated that the State was unwilling to fund Spina's placement at a secure juvenile treatment center out of state. To the contrary, John Paradise, the juvenile residential unit manager for the DOC, testified that due to the seriousness of the offense and other circumstances of the case, the DOC would prioritize the funding necessary to contract for Spina's secure placement in a juvenile facility. However, David Peterson, a juvenile parole officer with the DOC, testified that the longest Spina would likely remain in such a program was eighteen months, and in no case beyond the age of nineteen, when her commitment to the DOC would terminate by operation of § 52-5-101, MCA (1995). Peterson also testified that, although Spina would remain under the jurisdiction of the Youth Court until age twenty-one, the DOC would not be able to adequately supervise her probation due to the limited number of juvenile probation officers within a very large region and the number of cases each officer supervises.

¶80. From this, we conclude that the Youth Court did not err in determining that Spina was in need of long-term secure care beyond the age of nineteen and that the juvenile court system in Montana is inadequate to provide for the protection of the community and the necessary treatment Spina requires. We therefore affirm

**Conclusion of Law Nos. 26 and 27.**

Conclusion of Law No. 28

¶81. In Conclusion of Law No. 28, the Youth Court determined that the protection of the community warranted the transfer of Spina's case out of the juvenile system, because her amenability to treatment was speculative, and if her treatment was not successful during the short period of time she would remain in the juvenile system, she would pose a danger to the community upon her release. Spina argues that the Youth Court erred in concluding that Spina's amenability to treatment was speculative because objective evidence presented at the hearing demonstrated she would respond well to treatment.

¶82. The evidence presented at the transfer hearing was conflicting with regard to whether Spina could be treated, and if so, whether the length of her treatment in the juvenile system would be sufficient to assure the safety of the community upon her release. Resolving conflicts in evidence is the duty of the finder of fact, and this Court will not reweigh evidence on appeal. *T.N.*, 267 Mont. at 85, 881 P.2d at 1332. For this reason, we affirm the Youth Court's Conclusion of Law No. 28.

¶83. In summary, we conclude that the findings of fact and conclusions of law in the Youth Court's transfer order were not in error. Furthermore, we conclude that there was probable cause to believe that Spina committed the delinquent act alleged, that the seriousness of the offense and the protection of the community required treatment of Spina beyond that afforded by the juvenile facilities, and that the alleged offense was committed in an aggressive, violent, or premeditated manner. For these reasons, we hold that the Youth Court did not abuse its discretion in transferring Spina's case to the District Court and we therefore affirm the Youth Court's waiver of jurisdiction in this case.

¶84. 2. Do the transfer provisions of § 41-5-206, MCA (1995), violate Spina's right to equal protection under the law?

¶85. The Fourteenth Amendment of the United States Constitution and Article II, Section 4, of the Montana Constitution guarantee equal protection of the laws to all persons. *Matter of C.H.* (1984), 210 Mont. 184, 197-98, 683 P.2d 931, 941. To prevail

on an equal protection claim, an injured party must first be able to demonstrate that the law or governmental action at issue discriminates by impermissibly classifying persons and treating them differently on the basis of that classification. *See State v. Tadewaldt* (1996), 277 Mont. 261, 270, 922 P.2d 463, 468.

A classification within a law can be established in one of three ways. First, the law may establish the classification "on its face." This means the law by its own terms classifies persons for different treatment . . . Second, the law may be tested in its "application." In these cases the law either shows no classification on its face or else indicates a classification which seems to be legitimate, but those challenging the legislation claim that the governmental officials who administer the law are applying it with different degrees of severity to different groups of persons who are described by some suspect trait . . . Finally, the law may contain no classification, or a neutral classification, and be applied evenhandedly. Nevertheless the law may be challenged as in reality constituting a device designed to impose different burdens on different classes of persons.

John E. Nowak, et al., *Constitutional Law* 600 (2d ed. 1983). Additionally, it is a basic equal protection principle that the invidious quality of a law claimed to be discriminatory must ultimately be traced to an impermissibly discriminatory purpose. *Washington v. Davis* (1976), 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597.

¶86. It is well-established in Montana that a legislative enactment "is presumed to be constitutional and will be upheld on review except when proven to be unconstitutional beyond a reasonable doubt." *Zempel v. Uninsured Employers' Fund* (1997), 282 Mont. 424, 428, 938 P.2d 658, 661. A party attacking the constitutionality of a statute bears a significant burden in establishing its invalidity. *Zempel*, 282 Mont. at 428, 938 P.2d at 661.

¶87. Spina does not argue that the juvenile transfer statute is discriminatory on its face. Nor does Spina argue that female juvenile offenders as a class suffer from the Youth Court's discriminatory application of the transfer statute. Spina does, however, argue that the transfer statute, as applied to her under the particular facts of her case, resulted in discriminatory treatment on the basis of her gender.

¶88. The crux of Spina's argument is her assertion that the transfer of her case to the District Court was primarily motivated by the lack of affordable placement options

available for her within the juvenile system. It is Spina's contention that the lack of an in-state facility for girls and the State's failure to adequately fund alternative out-of-state placements for female juvenile offenders generated a budgetary impediment to her remaining in the juvenile system. Moreover, Spina asserts, because this budgetary impediment exists only in relation to female juvenile offenders, she has been unfairly discriminated against on the basis of her gender.

¶89. Our review of the record convinces us that the waiver of the Youth Court's jurisdiction over Spina's case was not predicated upon the inability of the State to fund secure placement for her within the juvenile system. All of the juvenile DOC officers who testified at the transfer hearing testified that if Spina remained in the juvenile system, her case would receive priority and funding would be made available for her placement in a secure juvenile facility. The primary concern in Spina's case was not that no such placements were available, or that there was no money with which to arrange for them, but that the duration of any such placement would not be long enough to rehabilitate her.

¶90. Also, the record indicates that upon her release from secure care, Spina would require continuing close supervision by the DOC's juvenile probation officers. However, evidence presented at the transfer hearing demonstrated that the quality of supervision required for an individual such as Spina is not available in the juvenile system. The record indicates this is true for all juvenile offenders, both male and female, so that while the difficulty in supervising Spina's probation may be spurred by budgetary concerns, there is no evidence these concerns are triggered on the basis of gender as Spina asserts.

¶91. Spina also argues that her transfer to District Court violates her right to equal protection because if she were convicted before the District Court and sentenced to the custody of the DOC as an adult, she would go directly into the adult women's correctional facility, whereas a male juvenile offender convicted before the District Court would be held at the juvenile correctional facility for boys until the age of majority and then placed at the adult male correctional facility. Such a placement policy, Spina contends, provides disparate treatment on the basis of gender and renders the juvenile transfer statute unconstitutional as applied to her.

¶92. We find this argument unpersuasive for the reason that the DOC's placement policy with regard to juvenile offenders who have been convicted and sentenced as

adults has no bearing on the constitutionality of the juvenile transfer statute. Any difference between the disposition of a female juvenile offender and a male juvenile offender sentenced as adults to the custody of the DOC presupposes that <u>both</u> offenders were transferred to the district court and tried as adults. Therefore, it is not the application of the transfer statute by the Youth Court that generates the alleged disparity in treatment, but rather the placement policies of the DOC after the youths have been transferred, tried, and convicted as adults.

¶93. Spina's equal protection challenge, however, is not leveled against the actions of the DOC in placing juvenile offenders within the adult penal system. Her argument focuses solely on the application of the juvenile transfer statute by the Youth Court. Even if Spina had challenged the placement policies of the DOC on equal protection grounds, it is questionable whether she would have standing to challenge those policies given the fact that she is not in the custody of the DOC and has not, in fact, been incarcerated in the women's correctional facility during the age of her minority. *See Missoula City-County Air Pollution Control Bd. v. Board of Environmental Review* (1997), 282 Mont. 255, 260, 937 P.2d 463, 466 ("[t]he constitutional aspect of standing requires the plaintiff to show that plaintiff has been personally injured or threatened with immediate injury by the alleged constitutional or statutory violation"). Because the issue is not properly before us, we decline to address whether DOC's alleged divergent policies regarding the placement of male and female juvenile offenders who have been convicted and sentenced as adults offend the equal protection clause.

¶94. We do, however, hold that § 41-5-206, MCA (1995), as applied to Spina in this case, did not violate her right to equal protection under the law.

¶95. 3. Do the juvenile transfer procedures of the Montana Youth Court Act violate Spina's rights under Article II, Section 15, of the Montana Constitution?

¶96. Article II, Section 15, of the Montana Constitution reads:

RIGHTS OF PERSONS NOT ADULTS. The rights of persons under 18 years of age shall include, but not be limited to, all the fundamental rights of this article unless specifically precluded by laws which enhance the protection of such persons.

The purpose of the provisions in Article II, Section 15, of the Montana Constitution is to guarantee to minors the same fundamental rights afforded to adults unless a law meant to protect children prohibits their enjoyment of the right. *See C.H.*, 210 Mont. at 202, 683 P.2d at 941.

**¶97. Spina contends that the statutory procedures for the transfer of a juvenile case to the District Court violate the provisions of Article II, Section 15, of the Montana Constitution by denying her certain fundamental rights which are accorded to adults under similar circumstances. In particular, Spina argues that her right against self-incrimination, her right to effective assistance of counsel, her right to a fair trial and her right to a presumption of innocence have all been infringed by the juvenile transfer procedures.**

**¶98. Spina argues that the provision of the Youth Court Act which authorizes the Youth Court to order a psychological evaluation of a youth at any time prior to final disposition violates her right against self-incrimination under the Fifth Amendment to the United States Constitution and Article II, Section 25, of the Montana Constitution, as well as her right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution, by requiring her to undergo an interrogation as to the facts of a criminal case prior to trial and without the presence of counsel. *See* § 41-5-523(4), MCA (1995). Spina contends that because an evaluation of this nature could not be required of an adult defendant in a criminal case, her guarantee of equal rights under Article II, Section 15, has been infringed.**

**¶99. Spina's contention regarding the constitutional infirmity of § 41-5-523(4), MCA (1995), is wholly without merit, because the statute expressly authorizes the Youth Court to order such an evaluation only "if the youth waives the youth's constitutional rights in the manner provided for in 41-5-303." Section 41-5-303, MCA (1995), reads in pertinent part:**

(a) The youth must be advised of his right against self-incrimination and his right to counsel.

(b) The youth may waive these rights under the following situations:

. . .

(ii) when the youth is under the age of 16 years and the youth and a parent or guardian agree, they may make an effective waiver; and

(iii) when the youth is under the age of 16 years and the youth and his parent or guardian do not agree, the youth may make an effective waiver only with advice of counsel.

**¶100. Spina's argument regarding the Youth Court's order that she undergo a psychological evaluation pursuant to § 41-5-523(4), MCA (1995), does not address whether a waiver of her rights was obtained prior to the examination, and the State's brief is likewise silent on this issue. Neither does the record on appeal provide any information regarding whether such a waiver was obtained. Because this issue was not raised before the District Court nor properly placed before us on appeal, we decline to address *sua sponte* whether the requirements of the transfer statute were properly followed in this case. *See State v. Black* (1995), 270 Mont. 329, 333, 891 P.2d 1162, 1164; *City of Kalispell v. Flathead County* (1993), 260 Mont. 258, 267, 859 P.2d 458, 461 (Trieweiler, J., dissenting).**

**¶101. Spina also argues that her right to a fair trial under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution was compromised during the transfer process because of the highly public nature of the results of the transfer proceedings. More particularly, Spina contends that both the Youth Court and the mental health professionals who testified at the transfer hearing made conclusory statements regarding her guilt which were subsequently published in the media and "in all probability, had a significantly negative impact on her ability to get a fair and impartial jury in Cascade County." Spina contends that such a result could not have occurred in the case of an adult because only juveniles may be made subject to a transfer proceeding prior to arraignment.**

**¶102. We reject Spina's argument that the transfer statute denied her a fair trial in this instance. A defendant's right to a fair trial is jeopardized when the publicity surrounding the case is inflammatory. *State v. Nichols* (1987), 225 Mont. 438, 444, 734 P.2d 170, 173. Publicity is not inflammatory merely because it is extensive; it must "show editorializing on the part of the media or any calculated attempt to prejudice public opinion . . . or to destroy the fairness of the pool from which his**

prospective jurors would be drawn." *State v. Armstrong* (1980), 189 Mont. 407, 423, 616 P.2d 341, 350. Media coverage is not inflammatory where it is factually accurate and contains the essential facts of the crime which will ultimately be presented to the jury anyway. *Nichols*, 225 Mont. at 445, 734 P.2d at 174.

¶103. Moreover, the law affords a defendant a number of mechanisms to protect against the effects of prejudicial publicity. *Voir dire* may be used to determine which potential jurors have been so affected by pretrial publicity they would be unable to render a fair verdict. *Nichols*, 225 Mont. at 444, 734 P.2d at 174. In some instances, the defendant may even request to have *voir dire* closed. *See Nichols*, 225 Mont. at 444-45, 734 P.2d at 174. The effects of potential prejudice may also be averted through the use of a proper instruction to the members of the jury. *See State v. Sullivan* (1994), 266 Mont. 313, 321, 880 P.2d 829, 834-35.

¶104. The only support Spina cites for her contention that her right to a fair trial was undermined by the publicity generated by the transfer hearing is her bald assertion that the jury pool in Cascade County was "probably" tainted. Spina does not cite any portion of the record which demonstrates that the transfer hearing generated inflammatory media coverage of her case. Nor does she cite to any portion of the record to demonstrate that the procedural mechanisms available for minimizing the effect of such prejudice were utilized by her at trial. For these reasons, we hold that Spina was not denied her right to a fair trial by an impartial jury as a result of her transfer by the Youth Court.

¶105. Finally, Spina contends that the transfer hearing violated her constitutional right to be presumed innocent until proven guilty because "she was, in effect, publicly branded as guilty by a psychiatrist and a respected judge." We find this argument also to be without merit.

¶106. The purpose of the transfer hearing was not to determine whether Spina was innocent or guilty as charged, but only whether there was probable cause to believe that she had committed the offense. The record reflects that the testimony of the mental health professionals in this case and the conclusions of the Youth Court in its transfer order did not purport to address the ultimate question of Spina's guilt. Also, Spina cites no portion of the record supporting her assertion that the members of her jury panel were impacted in any way by the testimony presented at the transfer hearing or the conclusions set forth in the Youth Court's transfer order.

**¶107. For the reasons set forth above, we conclude that the juvenile transfer procedures of the Montana Youth Court Act did not violate Spina's rights under Article II, Section 15, of the Montana Constitution.**

**¶108. Affirmed.**

/S/ J. A. TURNAGE

We concur:

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART