JUSTICE RICE
dissenting in part and concurring in part.
¶49 I respectfully dissent with the Court’s holding on Issue 2.
¶50 The Court arrives at a conclusion which seems to be “fair.” Indeed, requiring equal compensation for workers suffering from an equal impairment would also seem to be the essence of constitutional “equal *479 protection.” However, it is not. In reaching its decision, the Court has applied an incomplete constitutional analysis.
¶51 The Court’s opinion consists of a restatement of the rationale offered by the Court in Henry v. State Compensation Ins. Fund, 1999 MT 126, 294 Mont. 449, 982 P.2d 456, and a conclusion that “our reasoning in Henry is equally applicable to the facts before us.” Thus, a critique of the Court’s holding here must necessarily address Henry. First, however, a complete statement of our standards of constitutional review must be provided.
¶52 As the Court notes, the constitutionality of a legislative enactment is prima facie presumed, and every intendment in its favor will be presumed, unless its unconstitutionality appears beyond a reasonable doubt. Powell v. State Compensation Ins. Fund, 2000 MT 321, ¶ 13, 302 Mont. 518, ¶ 13, 15 P.3d 877, ¶ 13; State v. Price, 2002 MT 229, ¶ 27, 311 Mont. 439, ¶ 27, 57 P.3d 42, ¶ 27. But further, the question of constitutionality is not whether it is possible to condemn, but whether it is possible to uphold the legislative action, which will not be declared invalid unless it conflicts with the constitution beyond a reasonable doubt. Powell, ¶ 13; Price, ¶ 27. Every possible presumption must be indulged in favor of the constitutionality of a legislative act. Powell, ¶ 13; Price, ¶ 28. If any doubt exists about a statute’s constitutionality, that doubt must be resolved in favor of the statute. Powell, ¶ 13; Price, ¶ 28. If these words have actual meaning, they require a different result here.
¶53 The Court in Henry summarized its equal protection analysis of the 1987 amendments to the Workers’ Compensation Act (WCA) and the Occupational Disease Act (ODA) by its now-famous statement:
In sum, we can see no rational basis for treating workers who are injured over one work shift differently from workers who are injured over two work shifts. Simply put, a herniated disc is a herniated disc.
Henry, ¶ 44. Today, the Court again embraces this rationale in toto, concluding that workers injured under the two Acts “are distinguished merely by the number of work shifts over which their work-related affliction is sustained” and that such “disparate treatment of disabled workers based simply on the length of time” is not rationally related to a legitimate government interest. See ¶¶ 46 and 47 (emphasis added). However, the conclusion that workers injured under the two Acts are distinguished only by the number of work shifts was erroneous in Henry and is erroneous today. Although this error, given the issues in Henry, may not have affected the outcome there, it does *480 so here.
¶54 Henry’s conclusion that the 1987 amendments had fundamentally altered the definitions of “injury” and “occupational disease” so that they “no longer focus on the nature of the medical condition, but rather focus on the number of work shifts over which the worker incurs an injury” was flawed, in the first instance, because it failed to recognize ■that pre-1987 law had not focused on the nature of the condition either.[1] Henry, ¶ 43. Prior to 1987, this Court had recognized that the two distinctions between injury and disease were those which Larson had explained in his treatise, i.e., unexpectedness and time-definiteness:
The two crucial points of distinction between accident and occupational disease were the elements of unexpectedness and time-definiteness. What sets occupational diseases apart from accidental injuries was both the fact that they could not honestly be said to be unexpected, since they were recognized as inherent hazards of continued exposure to conditions of the particular employment, and the fact that they were gradual rather than sudden in onset. Thus, what would ordinarily be an occupational disease might be converted to an accident by an unusual and sudden dosage of the same kind of dust or fumes that, absorbed gradually over a long period, would produce typical industrial disease.
Larson, Workmen’s Compensation Law, Vol. IB, § 41.31 (1987) (emphasis added). Application of these factors led to numerous decisions involving various medical conditions which were considered either as injury, or as disease, depending only on how they occurred. Thus, for example, in 1983, we concluded that a phlebitis condition in the worker’s legs was an injury, rather than a disease, because of the manner in which it had developed — from extra work shifts during the course of one week. Wise v. Perkins (1983), 202 Mont. 157, 656 P.2d 816. We noted in Wise that the “two critical points of distinction” between injuries and diseases “are time definiteness and unexpectedness,” citing to Larson. Wise, 202 Mont. at 166, 656 P.2d at 820. Finding that the phlebitis neither “developed over time” nor was *481 “expected” from Wise’s work activities, we concluded that the condition constituted an injury and not a disease. Wise, 202 Mont. at 166, 656 P.2d at 820. Thus, the decision turned on the manner in which the condition was sustained, or caused, not the nature of the condition itself.
¶55 The Court’s citation to Hoehne v. Granite Lumber Co. (1980), 189 Mont. 221, 615 P.2d 863, precisely illustrates this point. The Court asserts that Stavenjord’s affliction, epicondylitis, “is exactly the kind of condition that would traditionally have been treated as an injury.” See ¶ 21. Support for this proposition is drawn from Hoehne, wherein we concluded that the carpel tunnel syndrome at issue was an injury. Hoehne is another case which demonstrates that it was not the nature of a condition which resulted in an injury determination, but rather, the manner by which the condition had been caused: by “a tangible happening of a traumatic nature.” In other words, under pre-1987 law, a medical condition was considered an “injury” when it was caused by an event or events defined as an injury under the statute. In Hoehne, we determined that the carpel tunnel syndrome was caused by a chain or series of “tangible happenings” (repeatedly stacking lumber), and therefore, constituted an injury. Wise and many other cases were decided on the same rationale. Thus, Henry’s conclusion that pre-1987 law was focused on the nature of the condition is simply not tenable. Rather, the focus has always been causation -the manner in which the condition was sustained. Indeed, the current proximate cause provision for occupational diseases, set forth in § 39-72-408, MCA, and discussed below, is identical to the proximate cause provision contained in the original Occupational Disease Act enacted by the Legislature in 1959. See 1959 Mont. Laws, ch. 155, sec. 5.
¶56 However, court decisions applying these statutes gave rise to considerable uncertainty in the law, and obvious difficulty in ascertaining whether conditions were injuries or diseases. The 1987 amendments sought to clarify and simplify this determination, as well as to fulfill other stated purposes: eliminate time-consuming, costly litigation, provide benefits to injured workers “speedily,” and provide constant premiums to employers. See § 39-71-105, MCA (1987), “Declaration of public policy.” However, notwithstanding the 1987 revisions, the traditional factors which distinguished injuries and diseases, namely, time-definiteness and unexpectedness, as well as other distinctions, were clearly retained, and remain a part of the 1997 version at issue here, and are discussed below. Thus, Henry’s conclusion that these distinctions had been erased in 1987 was also *482 flawed.
¶57 Causation for an injury is defined in § 39-71-119, MCA:
(2)An injury is caused by an accident. An accident is:
(a) an unexpected traumatic incident or unusual strain;
(b) identifiable by time and place of occurrence;
(c) identifiable by member or part of the body affected; and
(d) caused by a specific event on a single day or during a single work shift.
(4) “Injury” or “injured” does not include a disease that is not caused by an accident.
In contrast to the above definition of injury, but consistent with pre1987 law, an occupational disease is now defined as the same medical condition which would constitute an injury, but which occurs on more than one day or work shift, and which is proximally caused by the employment, a requirement which must not be demonstrated in order to establish an injury. Section 39-72-408, MCA, states as follows:
Proximate causation. Occupational diseases shall be deemed to arise out of the employment only if:
(1) there is a direct causal connection between the conditions under which the work is performed and the occupational disease;
(2) the disease can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;
(3) the disease can be fairly traced to the employment as the proximate cause;
(4) the disease does not come from a hazard to which workmen would have been equally exposed outside of the employment;
(5) the disease is incidental to the character of the business and not independent of the relation of employer and employee.
This proximate cause provision is necessary for occupational disease conditions because there is no clearly identifiable work injury caused by a single accident. As in pre-1987 law, time-definiteness and unexpectedness remain as the two causation-related distinctions between injury and disease. Further, the condition may be caused, in part, by conditions outside of employment, and thus, a connection to the employment must be established.
¶58 In a discussion of the differing exclusivity statutes for injuries and diseases, a dissenting opinion in Torres v. State (1995), 273 Mont. 83, 902 P.2d 999, noted some of the fundamental distinctions between diseases and injuries, including the possibility that diseases may have *483 contributing causes from outside of the employment, based upon the above-quoted definition of proximate cause, which, as mentioned, has been in effect since the ODA was originally enacted. The dissenting opinion explained that the distinctions between injuries and diseases required a different application of their respective exclusivity provisions:
[A]n occupational disease, by definition, occurs over a prolonged period of time, and unlike an industrial injury, may be caused from conditions that existed not only in the workplace, but elsewhere. That is why the Occupational Disease Act, unlike the Workers’ Compensation Act, specifically provides for apportionment of disability benefits based on the percent of a given disease or disability that is attributable to exposure that occurs during the course of employment. Section 39-72-706(1), MCA, specifically provides in relevant part that:
“[I]f disability ... from any other cause not itself compensable is aggravated, prolonged, accelerated, or in any way contributed to by an occupational disease, the compensation payable under this chapter must be reduced and limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of the disability ... as such occupational disease as a causative factor bears to all the causes of such disability....”
In other words, under the Occupational Disease Act, a claimant is entitled to recover only that portion of his or her disability benefits which represents the portion of his or her disability that arose out of employment. The Act specifically allows for an employer to disclaim liability for any portion of a person’s disability which is unrelated to employment. Therefore, based upon the previously mentioned statutes, that portion of disability would not be covered by the exclusive remedy provision found at § 39-72-305, MCA.
Torres, 273 Mont. at 92, 902 P.2d at 1005 (Trieweiler, J., dissenting). Thus, an occupational disease, unlike an injury, can develop over the course of time, while on duty and off duty, and while the claimant is working for more than one employer. The ODA, unlike the WCA, contemplates such development and the proper compensation therefor. However, this distinction, and the others discussed herein, have been brushed aside by the Court’s adoption of Henry’s erroneous conclusion that the only difference between the WCA and ODA is the number of shifts involved.
*484 ¶59 There are other distinctions as well. Consistent with its determination that injury and disease are caused differently, the Legislature enacted different notice provisions under each Act. Under the Workers’ Compensation Act, an injured worker must, within 30 days after the occurrence of the accident, give notice of the time and place of the accident, and the kind of injury sustained, to the employer or insurer. Because accidents are often obvious happenings, actual knowledge of the accident by the employer is deemed to be sufficient notice of the claim. Section 39-71-603(1), MCA. No such deeming of notice is provided for occupational diseases.
¶60 In contrast to the WCA’s 30-day requirement, the ODA requires a claim to be filed “within 1 year from the date the claimant knew or should have known that the claimant’s condition resulted from an occupational disease.” Section 39-72-403(1), MCA. These distinctive notice provisions are tied to the fundamental differences between injuries and diseases which remain in the law.
¶61 Further, consistent with its recognition of the differences between injuries and diseases, the Legislature created distinctions in the financial benefits which are available under the two Acts. It is this difference which the Court finds troubling, because the claimant here would have received a higher benefit had she sustained an injury, instead of a disease. While it is natural to feel sympathetic to someone in the claimant’s situation, a failure of parity can occur between any number of claimants under these Acts, depending on the circumstances, including the possibility that an ODA claimant may receive more than a WCA claimant, and this should not render the Acts unconstitutional. The Nevada Supreme Court, when faced with a similar equal protection challenge to Nevada’s occupational disease act by a diseased worker who was not eligible to obtain permanent partial disability benefits under a statute which limited those benefits to injured workers, recognized that:
[I]t is evident the legislature had a rational basis for denying permanent partial disability benefits to individuals suffering from an occupational disease. Diseases take a period of time to develop, and objective manifestations exacerbate and remit as an illness progresses. Arguably, this exacerbation-remission cycle makes it difficult to assess the anatomical percentage which may be assigned to a partial disability, and, therefore, we view the legislature as justified in drawing the distinction in question. We note, since 1947 the legislature has paid particular attention to the Occupational Disease Act through repeated amendment, but *485 has never seen fit to provide permanent partial disability awards for occupational respiratory diseases. [Citations omitted.] While it may be a better practice to provide such compensation to a diseased employee, that determination must rest with the legislature.
Holt v. Nevada Industrial Commission (Nev. 1978), 578 P.2d 752, 753 (emphasis added).
¶62 Imbedded into the constitutional law of this country and this state is the principle that the legislature is the body which is charged with drawing lines and making choices, even if those choices are illogical or unfair. These differences, in and of themselves, do not render such decisions violative of equal protection. As we have recognized:
To a certain extent, nearly all legislation sets forth classifications regarding applicability, benefits and recipients; the fact that some of these classifications are imperfect does not necessarily mandate a conclusion that they violate the equal protection clause.
Gulbrandson v. Carey (1995), 272 Mont. 494, 503, 901 P.2d 573, 579 (citing Arneson v. State (1993), 262 Mont. 269, 274, 864 P.2d 1245, 1248). In fact, a presumption arises that imprudent legislative decisions will ultimately be corrected by the legislative body. As noted by the United States Supreme Court:
[C]ourts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws. The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.
Vance v. Bradley (1979), 440 U.S. 93, 97, 99 S.Ct. 939, 942-43, 59 L.Ed.2d 171, 176. Vance’s statement that the legislature must act with “antipathy,” at least inferred, to violate equal protection guarantees, is a requirement which has been reiterated by this Court. As we recently held in Price:
“It is a basic equal protection principle that the invidious quality of a law claimed to be discriminatory must ultimately be traced to an impermissibly discriminatory purpose.” [State v.] Spina, ¶ 85 [1999 MT 113, 294 Mont. 367, 982 P.2d 421] (citing Washington v. Davis (1976), 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597, 607-08). None exists here.
Price, ¶ 41.
*486 ¶63 Neither has such a purpose been demonstrated here. Without a doubt, the Legislature chose to draw lines which differentiated injuries from diseases, established different timing and administrative requirements for each type of claim, and provided different benefits for each. However, reviewing these Acts as a whole, instead of focusing on the single factor of the number of work shifts, reveals that the appropriate legislative purposes at work here-provision of workable definitions of injury and disease, elimination of prolonged litigation by a self-administering system, speedy payment of benefits to workers, and constant insurance rates for employers-are legitimately served by the statutory scheme. I conclude from this review, and the historical distinctions between injury and disease that still prevail in the law, that there is a class of workers who sustain an injury, and a separate class of workers who sustain an occupational disease, and that these classes are not, for the reasons discussed above, similarly situated. It is, therefore, “possible to uphold the legislative action.” Powell, ¶ 13. I would do so and reverse the decision of the Workers’ Compensation Court, which necessarily followed the erroneous language expressed in Henry.
¶64 Given that the Acts’ legitimate purposes are demonstrated in the legislation itself, I find no error in the Workers’ Compensation Court’s denial of the State Fund’s motion to reopen evidence, and therefore, on that issue, I concur with the Court.
CHIEF JUSTICE GRAY joins in the foregoing dissenting and concurring opinion of JUSTICE RICE.

 Arguably, there was more of a “focus” on the nature of the condition at issue when the ODA specifically listed occupational diseases, such as silicosis, anthrax and tamarack poisoning, as opposed to the general reference to “all diseases,” for which the ODA was later amended to provide coverage. However, coverage for both injuries and diseases has always been dependent upon, and thus “focused” on, causation, as our case law reveals.