FILED

03/17/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0200

DA 25-0200

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 53

MONTANANS AGAINST IRRESPONSIBLE
DENSIFICATION, LLC,

        Plaintiff, Appellee,
        and Cross-Appellant,

    v.

STATE OF MONTANA,

        Defendant and Cross-Appellee,

SHELTER WF, INC., and MONTANA
LEAGUE of CITIES and TOWNS,

        Defendant-Intervenors, Appellants,
        and Cross-Appellees,

DAVID KUHNLE, CLARENCE KENK,

        Defendant-Intervenors
        and Cross-Appellees.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                 In and For the County of Gallatin, Cause No. DV-23-1248
                 Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

        For Appellant Montana League of Cities and Towns:

                Murry Warhank, Scott Svee, Jackson, Murdo & Grant, Helena, Montana

        For Appellant Shelter WF, Inc.:

                Jesse Kodadek, Parsons Behle & Latimer, Missoula, Montana

        For Appellee Montanans Against Irresponsible Densification, LLC;

                James H. Goetz, Henry J.K. Tesar, Goetz, Geddes & Gardner, P.C., Bozeman, Montana

                Brian K. Gallik, Gallik & Bremer, P.C., Bozeman, Montana

For Cross-Appellee State of Montana:

    Austin Knudsen, Montana Attorney General, Michael D. Russell, Thane Johnson, Alwyn Lansing, Michael Noonan, Assistant Attorneys General, Helena, Montana

For Cross-Appellees David Kuhnle and Clarence Kenck:

    Ethan W. Blevins, Pacific Legal Foundation, Bountiful, Utah

    Mark Miller, Pacific Legal Foundation, Palm Beach Gardens, Florida

    David McDonald, Pacific Legal Foundation, Arlington, Virginia

For Amicus Curiae Better Bozeman Coalition:

    Brian F. Close, Attorney at Law, Bozeman, Montana

For Amicus Curiae Flathead Families For Responsible Growth:

    Michelle T. Weinberg, Michelle T. Weinberg, PLLC, Missoula, Montana

For Amicus Curiae American Planning Association:

    Alan F. McCormick, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

    Andrew L.W. Peters, Otten, Johnson, Robinson, Neff + Ragonetti, P.C., Denver, Colorado

    Brian J. Connolly, University of Michigan, Ann Arbor, Michigan

For Amicus Curiae Institute For Justice:

    David F. Knobel, Taylor Thompson, Crowley Fleck, PLLP, Billings, Montana

    Joseph Gay, Institute For Justice, Arlington, Virginia

Submitted on Briefs: November 5, 2025

Decided: March 17, 2026

Filed:

_____

2

Justice Beth Baker delivered the Opinion of the Court.

¶1 Montanans Against Irresponsible Densification, LLC (MAID) facially challenged the constitutionality of several zoning and land use bills enacted during the 2023 legislative session. The State of Montana and several intervenors defended the new laws. The Eighteenth Judicial District Court entered a declaratory judgment, concluding that the challenged housing reform bills do not violate the constitutional right to equal protection and did not supplant private restrictive covenants. It enjoined several sections that the court determined violated Montana's constitutional right to participate. The parties appeal and cross-appeal the District Court's rulings. We consider the following restated issues on appeal:

> *1. Do MAID's claims that the Montana Land Use Planning Act (MLUPA) violates Montanans' right to participate present a justiciable controversy?*
>
> *2. Do the challenged laws facially violate the public's constitutional right to participate in site-specific land use decisions?*
>
> *3. Do the challenged land use statutes violate the right to equal protection by irrationally and detrimentally burdening certain classes of citizens?*

¶2 We agree that MAID's challenges to the MLUPA's public participation provisions are justiciable. We reverse the District Court's conclusion that the MLUPA facially violates the constitutional right to participate. We affirm the District Court's determination that the housing reform statutes do not violate the right to equal protection. We vacate its declaratory ruling on private restrictive covenants as nonjusticiable.

3

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 The 2023 Montana Legislature passed a package of bipartisan housing reform bills related to zoning and land use planning, aimed at addressing Montana's housing problems. *Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, ¶ 21, 418 Mont. 78, 555 P.3d 759 (*MAID I*). Relevant here, the package included:

- Senate Bill 528, 2023 Mont. Laws ch. 502, codified as § 76-2-345, MCA, requiring that all municipalities "adopt regulations . . . that allow a minimum of one accessory dwelling unit [(ADU)] by right on a lot or parcel that contains a single-family dwelling."

- Senate Bill 323, 2023 Mont. Laws ch. 445, codified as §§ 76-2-304(3), (5), -309, MCA, amending § 76-2-304, MCA, to require cities with a population of at least 5,000 residents to allow duplexes where single-family dwelling is permitted.

- Senate Bill 382, 2023 Mont. Laws ch. 500, codified as Title 76, chapter 25, MCA, creating the Montana Land Use Planning Act (MLUPA), which applies to municipalities equal to or greater than 5,000 located in counties with populations at or exceeding 70,000. The MLUPA requires communities that meet this population benchmark to substantially change their subdivision and zoning regulations and long-range community planning. The MLUPA also defines public participation in this process.

¶4 In December 2023, MAID filed a complaint alleging several facial challenges to the constitutionality of the 2023 housing reform bills. A Montana limited liability company, MAID is made up of property owners who live in single-family neighborhoods in

Whitefish, Bozeman, Billings, Missoula, Great Falls, Columbia Falls, and Kalispell. MAID's principal contention was that the housing reform unfairly burdened single-family residential neighborhoods with urban growth and accomplished this by—among other things—undermining the MLUPA-municipality citizens' right to know and participate during the land-use planning and approval process. MAID prayed for declaratory relief and a preliminary and permanent injunction. [1]

¶5 Finding a potential for irreparable harm once they went into effect, the District Court preliminarily enjoined the implementation and enforcement of two 2023 housing reform bills on December 29, 2023. The State appealed. This Court, in *MAID I*, reversed the District Court's decision and remanded for further proceedings. *MAID I*, ¶ 23. On remand, Shelter WF, the Montana League of Cities and Towns (the League), David Kuhnle, and Clarence Kenck intervened with leave of court to defend the housing reform statutes. Following its consideration of the parties' motions and cross-motions to dismiss and for summary judgment, the District Court issued its decision on the motions now before this Court.

---

[1] Senate Bill 245, 2023 Mont. Laws ch. 499, codified as § 76-2-304(4), MCA, requires that urban municipalities with population of at least 5,000 allow multiple-unit dwelling and mixed-used developments in commercial zones under certain conditions. In MAID's second motion for summary judgment and on appeal, it claims to continue to challenge the constitutionality of § 76-2-304(4), MCA, without elaboration. MAID's arguments are premised on the rights of homeowners located in single-family neighborhoods. MAID does not develop its claim that § 76-2-304(4), MCA—a statute addressing commercial zones—violates the constitution under its argument that the housing reform statutes eliminate single-family zoning. We, therefore, do not address its constitutionality on appeal. *McCulley v. Am. Land Title Co.*, 2013 MT 89, ¶¶ 19-20, 369 Mont. 433, 300 P.3d 679 ("[W]e are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend to his position." (citations omitted)).

¶6 In Count I, MAID sought a declaratory judgment that §§ 76-2-304, -309, -345, MCA, and the MLUPA could not supersede more restrictive covenants that prohibited ADUs and duplexes. The State and the Defendant-Intervenors argued that this claim was non-justiciable because either (1) all parties agreed that the newly enacted laws did not conflict with the right to contract or (2) issuance of the declaratory judgment relied on theoretical interests and thus was an advisory opinion. Noting that one of MAID's members lived in an area governed by covenants more restrictive than the laws requiring municipalities to permit duplexes and ADUs, the District Court found the claim justiciable and granted MAID's motion on Count I. Shelter WF appeals this ruling, arguing that MAID's claims were nonjusticiable and the District Court's declaratory judgment was an advisory opinion.

¶7 In Count II, MAID claimed that the MLUPA infringed on the public's right to participate and right to know under Article II, Sections 8 and 9, of the Montana Constitution, because it deemed site-specific project approval ministerial and unconstitutionally curtailed public participation. The District Court granted summary judgment in favor of MAID on Count II. The court concluded that the statutory scheme governing a planning administrator's approval process for site-specific developments violated Article II, Section 8, of the Montana Constitution, because those decisions called for the exercise of judgment without requiring notice and allowing public input. It permanently enjoined §§ 76-25-106(4)(d), -305(4)-(6), and -408(7)(a)-(b), (8)(a)-(b), MCA (2023), which limited public participation at the site-specific stage. On appeal, the League argues that the MLUPA's public participation sections were not ripe for review

6

because municipalities are not required to implement localized participation plans until 2026. Shelter WF and the League also contend that the 2025 Senate Bill 121, 2025 Mont. Laws ch. 555, amending the MLUPA's public participation provisions, mooted the District Court's decision under Count II.

¶8 In Count III, MAID challenged §§ 76-2-304, -309, -345 MCA, and the MLUPA, alleging violations of equal protection on two grounds. First, the housing reform bills irrationally burden parties not protected by private restrictive covenants. Second, the MLUPA arbitrarily created new regulations for communities based on population. The District Court concluded that MAID failed to establish under either argument that the groups were similarly situated. MAID's cross-appeal argues that the District Court failed to fully and properly analyze the purported classes' similar situations other than the factor constituting the discrimination. [2]

¶9 By leave of Court, the American Planning Association (APA) and Institute for Justice filed amicus curiae briefs, supporting the housing reform bills. Flathead Families for Responsible Growth and Better Bozeman Coalition filed amicus curiae briefs against the constitutionality of the housing reform bills.

## STANDARDS OF REVIEW

¶10 This Court reviews a district court's ruling on summary judgment de novo. *Reichert v. State ex rel. McCulloch*, 2012 MT 111, ¶ 18, 365 Mont. 92, 278 P.3d 455. Summary

---

[2] The District Court granted summary judgment against MAID on two additional claims, Counts IV and V of the complaint. No party on appeal challenges the District Court's dismissal of these two counts, and we therefore do not disturb the court's decision.

7

judgment is appropriate when the moving party shows that there exists no genuine issue of material fact and that they are entitled to judgment as a matter of law.  M. R. Civ. P. 56(c)(3); *Reichert*, ¶ 18.  We review motions to dismiss de novo.  *In re Estate of Swanberg*, 2020 MT 153, ¶ 6, 400 Mont. 247, 465 P.3d 1165.  This Court reviews questions of justiciability de novo.  *Reichert*, ¶ 20.  When a district court issues a permanent injunction based on a conclusion of law, we review for correctness.  *Reichert*, ¶ 21.

¶11     We review a district court's interpretation and construction of constitutional and statutory provisions de novo, determining whether its interpretation was correct.  *Reichert*, ¶ 18.  The text of the Montana Constitution is "given a broad and liberal interpretation."  *Bryan v. Yellowstone Cnty. Elem. Sch. Dist. No. 2*, 2002 MT 264, ¶¶ 23, 44, 312 Mont. 257, 60 P.3d 381 (citation omitted).  We "presume [that] all statutes are constitutional, and we attempt to construe them in a manner that avoids unconstitutional interpretations."  *Oberson v. U.S.D.A.*, 2007 MT 293, ¶ 14, 339 Mont. 519, 171 P.3d 715 (internal quotations omitted; citations omitted).  To prevail on a facial challenge, the plaintiff bears "the heavy burden to show" that "no set of circumstances exists under which the challenged sections would be valid, *i.e.*, that the law is unconstitutional in all of its applications," *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 14, 382 Mont. 256, 368 P.3d 1131 (*MCIA*) (citations omitted; internal quotations omitted; brackets omitted), or that the law "lacks any 'plainly legitimate sweep,'" *Hensley v. Mont. State Fund*, 2020 MT 317, ¶ 17, 402 Mont. 277, 477 P.3d 1065 (citations omitted).  *See also Advoc. For Sch. Tr. Lands v. State*, 2022 MT 46, ¶ 29, 408 Mont. 39, 505 P.3d 825 (*Advocates*).

**DISCUSSION**

¶12 The Legislature enacted the MLUPA for the purpose of promoting the "health, safety, and welfare of the people of Montana through a system of comprehensive planning that balances" the needs and interests of a MLUPA municipality and its citizens. Section 76-25-102(1), MCA.[3] It is the Legislature's intent that the MLUPA's comprehensive planning framework "provid[e] the broadest and most comprehensive level of collecting data" and "provid[e] for broad public participation." Section 76-25-102(3), MCA. The framework "serve[s] as a basis for implementing specific land use regulations that are in substantial compliance with the local land use plan," as well as a streamlined process for review of site-specific development applications. Section 76-25-102(3), MCA.

¶13 Section 76-25-106, MCA, explains the MLUPA's notice and participation process prior to the adoption, amendment, or update of the land use plan, zoning regulations, and subdivision regulations. Sections 76-25-201(2)(a), (5)(b), -202(1)(b), -304(2)(a), (5)(b), -403(2)(a), (3), (5)(b), MCA. The statute instructs local governments to emphasize "[t]hroughout the adoption, amendment, or update of the land use plan or regulation" that "the process provides for continuous and extensive public notice, review, comment, and participation . . . ." Section 76-25-106(4)(b), MCA. The MLUPA municipality must provide, at a minimum: (1) "dissemination of draft documents"; (2) "an opportunity for written and verbal comments"; (3) "public meetings after effective notice"; (4) "electronic communications regarding the process"; and (5) "an analysis of and response to public

---

[3] Unless otherwise indicated, all statutory references are to the 2023 Montana Code Annotated.

comments." Section 76-25-106(1)(b), MCA. The MLUPA municipality may decide its method of general notice for public participation in the adoption, amendment or update of the land use plan and regulations as well as notice of written comments for applications of land use permits. Section 76-25-106(3)(a), MCA. All notices, however, "must clearly specify the nature of the land use plan or regulation under consideration, what type of comment the local government is seeking from the public, and how the public may participate." Section 76-25-106(3)(b), MCA.

¶14 Under the MLUPA, qualifying municipalities must adopt a land use plan and future land use map (collectively "land use plan"). Section 76-25-201(1), MCA. Public participation is required at this stage. Section 76-25-201(2)(a), MCA. The land use plan must be reviewed every five years to determine whether an update to the plan is necessary; public participation is required prior to this determination and during any of the resultant updates. Section 76-25-202(1), (4), MCA. The MLUPA municipality also must adopt zoning and subdivision regulations in substantial compliance with its land use plan. Section 76-25-301, -401, MCA. Public participation also is required at these stages, as well as prior to any amendments to those regulations. Sections 76-25-304(2)(a), (5)(b), -403(2)(a), (5)(b), MCA. Amendments to the land use plan, zoning regulations, and subdivision regulations may be initiated by majority vote of the governing body, by petition, or by a property owner. Section 76-25-201(6), -304(1)(b), -403(1)(b), MCA. The governing body may not update or amend the land use plan or adopt or amend local zoning or subdivision regulations unless (1) the proposed provisions are in substantial compliance with the land use plan and other applicable regulations and (2) the resulting impacts "have

10

been made available for public review and comment and have been fully considered by the governing body." Sections 76-25-201(8), -202(4), -304(5)(d), -403(5)(c), MCA.

¶15    The genesis of MAID's public participation claims is found in § 76-25-106(4)(d), MCA (2023 Mont. Laws ch. 500, § 6(4)(d)), which states:

> [T]he scope of and opportunity for public participation and comment on site-specific development in substantial compliance with the land use plan *must* be limited only to those impacts or significantly increased impacts that were not previously identified and considered in the adoption, amendment, or update of the land use plan, zoning regulation, or subdivision regulations.

(Emphasis added). In other words, the local government may approve without further public review or comment proposed developments, with or without deviations or variances, that are in substantial compliance with the land use plan and regulations and whose impacts or increase of impacts previously have been considered. Sections 76-25-305(4)-(6), -408(7), MCA (2023 Mont. Laws ch. 500, §§ 22(4)-(6), 29(7)). A written decision to approve, conditionally approve, or deny such proposed developments that do not subdivide property, § 76-25-103(32), MCA (2023 Mont. Laws ch. 500, § 3(32)), is not required to be made publicly available. Section 76-25-305, MCA (2023 Mont. Laws ch. 500, § 22). A written decision for proposed subdivisions, however, must be made available to the public and must include information regarding the appeal process. Section 76-25-408(7)-(12), MCA (2023 Mont. Laws ch. 500, § 29(7)-(12)).

¶16    A planning administrator is required to provide public review and comment only when a proposed development or subdivision "result[s] in new or significantly increased potential impacts that have not been previously identified and considered in the adoption or amendment of the land use plan or . . . regulations." Sections

11

76-25-305(4)-(6), -408(7)-(8), MCA (2023 Mont. Laws ch. 500, §§ 22(4)-(6), 29(7)-(8)). When this occurs, the planning administrator must give public notice and provide a fifteen-business-day public comment period, "limited to only [those identified] new or significantly increased potential impacts." Sections 76-25-305(5)-(6), -408(8), MCA (2023 Mont. Laws ch. 500, §§ 22(5)-(6), 29(8)).

¶17 As relevant to site-specific land use approvals, an "applicant or any aggrieved person" may appeal the planning administrator's decision to approve, conditionally approve, or deny "zoning permits, preliminary or final plat, imposition of a condition on a zoning permit or plat, approval or denial of a variance from a zoning or subdivision regulation, or interpretation of land use regulations or map" within fifteen business days of the challenged decisions. Section 76-25-503(3), MCA. The planning commission must hold a hearing limited to the issues raised on appeal and review the planning administrator's decision de novo. Section 76-25-503(3)(c), MCA. Once the planning commission issues its written decision, the applicant, planning administrator, or any aggrieved party may appeal to the governing body within fifteen business days. Section 76-25-503(3)(c), (4), MCA. The governing body reviews the planning commission's decision de novo and is limited to the issues raised on appeal. Section 76-25-503(4)(c), MCA.

¶18 Senate Bill 121, 2025 Mont. Laws ch. 555—passed during the pendency of this appeal—substantially amended the MLUPA's public participation provisions to include notice of initial determinations on site-specific developments, a fifteen-day public comment period after those determinations, and a reiterative approval process involving

12

the public, the developer, and the planning administrator. *See* Sections 76-25-305, -408, MCA (2025 Mont. Laws ch. 555, §§ 11-12). The Legislature expressly included a "sunset clause" to terminate Senate Bill 121's sections 11 through 13, which contain most of the MLUPA public participation amendments, on June 30, 2027. 2025 Mont. Laws ch. 555, § 16.

¶19 *1. Do MAID's claims that the Montana Land Use Planning Act (MLUPA) violates Montanans' right to participate present a justiciable controversy?*

¶20 The power of Montana courts is limited to "justiciable controversies." *Reichert*, ¶ 53 (citing *Plan Helena, Inc. v. Helena Reg'l Airport Auth.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567); Mont. Const. art. VII, § 4. A justiciable controversy requires parties with an existing and genuine—as opposed to theoretical—right or interest upon which a judgment may effectively operate to resolve an actual dispute regarding the parties' status or legal relationship. *Montana-Dakota Utils. Co. v. City of Billings*, 2003 MT 332, ¶ 9, 318 Mont. 407, 80 P.3d 1247. The existence of a justiciable controversy is a threshold requirement for the court's adjudication. *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 18, 333 Mont. 331, 142 P.3d 864.

¶21 Courts have elaborated on the question of justiciability, creating more specific doctrines with unique legal standards—such as standing, ripeness, mootness, and advisory opinions. *Greater Missoula Area Fed'n of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 23, 353 Mont. 201, 219 P.3d 881. Mootness and ripeness are "the time dimensions of standing." *Reichert*, ¶ 55 (citation omitted). To have standing, a party must "clearly allege a past, present, or threatened injury to a property or civil right, and the injury

13

must be one that would be alleviated by successfully maintaining the action." *Reichert*, ¶ 55 (citation omitted). Standing determines whether the proper party is suing; mootness and ripeness resolve whether the party is suing at the proper time. *Reichert*, ¶ 55.

**Mootness**

¶22 When determining whether a claim is moot, a court "asks whether an injury that has happened is too far beyond a useful remedy." *Reichert*, ¶ 55 (citations omitted). A case is moot when the "issue has ceased to exist and no longer presents an actual controversy . . . . [and] the court cannot grant effective relief." *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, 974 P.2d 1150 (citations and quotations omitted). It must be "absolutely clear that the alleged wrongful [act] could not reasonably be expected to recur." *Heringer as Tr. of Charles J. Heringer, III, Trust dated May 20, 1999 v. Barnegat Dev. Grp., LLC*, 2021 MT 100, ¶ 20, 404 Mont. 89, 485 P.3d 731) (*Heringer*) (citation omitted). The parties must have a personal stake in the controversy "at the beginning of litigation, and at every point thereafter, unless an exception to the doctrine of mootness applies." *Havre Daily News*, ¶ 31.

¶23 One such exception is the "voluntary cessation exception," which occurs when the challenged issue "is of indefinite duration, but is voluntarily terminated by the defendant prior to completion of appellate review . . . ." *Havre Daily News*, ¶¶ 31, 34 (citations omitted). In such cases, there must be a reasonable expectation that the "same wrong" will recur, and a ruling on the merits would provide a "discernible future benefit to the litigants or [serve] the interests of judicial economy." *Heringer*, ¶ 20 (internal quotation and citations omitted). Evidence—not speculation or allegation—must support the reasonable

14

expectation that the alleged wrongful act will recur. *Heringer*, ¶ 20 (citation and quotations omitted). Because voluntary cessation may be used to "manipulate the litigation process, the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Havre Daily News*, ¶¶ 31, 34 (citations omitted; internal quotations omitted; brackets omitted).

¶24 The League and Shelter WF ask this Court to vacate the District Court's declaration that §§ 76-25-106(4)(d), -305(4)-(6), -408(7)(a)-(b), (8)(a)-(b), MCA, are unconstitutional and its order enjoining their implementation. These Appellants allege that Senate Bill 121, 2025 Mont. Laws ch. 555, mooted the issue because the public participation provisions that the District Court struck no longer will be implemented. Neither party meaningfully addresses the effect that Senate Bill 121's termination provision has on their argument that the issue is moot. MAID maintains that its claim is not moot, asserting that Senate Bill 121's amendments to the MLUPA's public participation provisions are still unconstitutional and that, regardless, they will terminate in 2027, and the stricken provisions thus are likely to recur.

¶25 Without contrary action in the 2027 legislative session, the 2025 amendments will terminate. Senate Bill 121's sunset clause is evidence supporting the reasonable expectation that Senate Bill 382's public participation provisions are likely to recur and will be the laws implemented after June 2027. The League and Shelter WF have not rebutted this evidence or shown legislative intent to be otherwise and therefore have not met their heavy burden to prove that the provisions cannot reasonably be expected to recur.

15

The State of Montana makes no argument for mootness.[4] As the law stands, Senate Bill 382's public participation provisions are effectively held in abeyance. Without adjudication on the merits, the litigants—as well as the MLUPA municipalities and its citizens—will be left without a resolution on the facial constitutionality of the MLUPA's public participation provisions come July 2027. A live controversy exists, and our determination on the merits will effectively operate to resolve the persisting dispute between the parties on the constitutionality of Senate Bill 382, 2023 Mont. Laws ch. 500.[5]

**Ripeness**

¶26 MAID challenges the MLUPA under Montana's constitutional provision that affords the public the right to expect the "reasonable opportunity . . . [to] participat[e] in the operation of the agencies prior to the final decision . . . ." Mont. Const. art. II, § 8. MAID contends that the statute is facially unconstitutional by limiting public participation on site-specific development applications to only "those impacts or significantly increased impacts that were not previously identified and considered in the adoption, amendment, or update of the land use plan, zoning regulations, or subdivision regulations." Section 76-25-106(4)(d), MCA. The League maintains that MAID's challenge to the MLUPA's public participation provisions is not ripe because municipalities are not required to enact

---

[4] The State does not address the District Court's public participation rulings in its brief.

[5] The 2025 amendments did attempt to cure many of the claimed notice and participation deficiencies with the 2023 law. Because those amendments to the MLUPA's public participation provisions were not before the District Court, our review does not address the parties' arguments specific to those amendments. *Mont. Deaconess Med. Ctr. v. Doherty*, 241 Mont. 243, 246-47, 786 P.2d 669, 671-72 (1990) ("We may on appeal review only those issues decided by the District Court . . . ."); *State v. Longfellow*, 2008 MT 343, ¶ 19, 346 Mont. 286, 194 P.3d 694 ("[W]e generally do not address issues raised for the first time on appeal.").

localized public participation ordinances until May 2026. The League relies on *Advocates for School Trust Lands* and *State v. Whalen*, 2013 MT 26, 368 Mont. 354, 295 P.3d 1055, to argue that MAID's claims are "speculative[,] . . . devoid of factual specifics," and are "abstract and therefore unripe." The League suggests that a municipality first must adopt ordinances implementing a site-specific review process in conformance with the MLUPA, and that MAID's members next must subject themselves to that process by objecting to a development.

¶27    To determine whether a claim is ripe, a court "asks whether an injury that has not yet happened is sufficiently likely to happen or, instead, is too contingent or remote to support present adjudication . . . ." *Reichert*, ¶ 55 (citations omitted). Ripeness has both constitutional and prudential components. *Advocates*, ¶ 20 (citing *Reichert*, ¶ 56). The constitutional component is closely related to standing: whether the issues are "definite and concrete, not hypothetical and abstract." *Advocates*, ¶ 20 (citing *Reichert*, ¶ 56; *Weems v. State*, 2019 MT 98, ¶ 11, 395 Mont. 350, 440 P.3d 4). The prudential component is the court's discretionary limitation, weighing "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Reichert*, ¶¶ 53, 56 (citing *Plan Helena*, ¶ 6, *Greater Missoula*, ¶ 22; *Heffernan v. Missoula City Council*, 2011 MT 91, ¶¶ 31-33, 360 Mont. 207, 255 P.3d 80). An issue is fit for judicial decision when the Court determines that "there is a factually adequate record upon which to base effective review." *Reichert*, ¶ 56 (citing *Havre Daily News*, ¶ 20). The more the court's inquiry is purely one of law and less of fact, the more likely the issue is ripe. *Reichert*, ¶ 56 (citing *Havre Daily News*, ¶ 20).

¶28 A court may determine the facial constitutionality of an authorizing statute prior to the enactment of its corollary municipal ordinances. For example, in *Montana Democratic Party v. Jacobsen*, the Legislature directed the Secretary to promulgate rules that would prohibit anyone from accepting a "pecuniary benefit" when assisting voters in returning their ballot. *Mont. Democratic Party v. Jacobsen*, 2024 MT 66, ¶ 7, 416 Mont. 44, 545 P.3d 1074 (*MDP*). The Secretary of State argued that because it had not gone through the administrative rule-making process, the plaintiffs did not know whether their activities would be prohibited. *MDP*, ¶ 90. But because a rule must "effectively effectuate the purpose of the statute" to be valid and because the statute was clear on its face what was prohibited, we held the case did not present a hypothetical dispute and was ripe for review. *MDP*, ¶¶ 94-95 (citation omitted).

¶29 We presume that ordinances will effectuate and be consistent with the statute's stated purpose. *Carlson v. City of Bozeman*, 2001 MT 46, ¶ 21, 304 Mont. 277, 20 P.3d 792 ("[A] city cannot enact ordinances which are repugnant to established law.") (citations omitted); *See also cf. MDP*, ¶ 94 (citing *Michels v. Dep't of Soc. Rehab. Servs.*, 187 Mont. 173, 177-78, 609 P.2d 271, 273 (1980)). A constitutional issue may be ripe if the challenge is directed at "the broader language of the statute itself and not [an ordinance] that might be adopted in the future[,]" *MDP*, ¶ 94, and the parties are able to articulate their dispute as a question of law specific to the challenged statutory language, *MEA-MFT v. McCulloch*, 2012 MT 211, ¶ 18, 366 Mont. 266, 291 P.3d 1075.

¶30 In *Advocates for School Trust Lands*, the plaintiffs challenged a newly enacted law as facially unconstitutional because it violated the State's trust obligation. *Advocates*, ¶ 4.

The Advocates raised two facial challenges: (1) the statute "ipso facto reduce[d] the value of the affected school trust lands"; and (2) the law "create[d] a presumption against State ownership of water rights used on state lands." *Advocates*, ¶ 24. Advocates' first claim was not ripe under the constitutional component because they identified only a "hypothetical injury" with no basis in the actual devaluation of trust land. *Advocates*, ¶¶ 26-27. We found that Advocates' first claim also "hinge[d] on the development of additional facts"—such as whether the State would comply with the statutory process and whether state trust lands actually would depreciate—and thus failed the prudential component of ripeness. *Advocates*, ¶¶ 26-27. In contrast, we found that Advocates' second claim—that the bill created a presumption against State ownership of water rights used on state lands—did not "depend on the development of a factual record" and effectively challenged the bill's constitutionality as purely a question of law. *Advocates*, ¶ 29 (citing *Reichert*, ¶ 60; *Havre Daily News*, ¶ 20; *Hensley,* ¶ 17). We held the second challenge ripe. *Advocates*, ¶ 29.

¶31 Here, the MLUPA directs municipalities to "adopt a public participation plan detailing how the local government will meet the requirements of this section." Section 76-25-106(5), MCA. As the League observes, some public participation provisions allow a MLUPA municipality to tailor its ordinances according to its particular needs. *See* § 76-25-106, MCA. Similar to the Secretary in *Montana Democratic Party*, the League asserts that this Court cannot know "the nature of the alleged harm threatened to MAID and its members" because the ordinances directly governing public participation have not gone into effect. Senate Bill 382's site-specific limitations on public participation,

19

however, require all municipalities to preliminarily approve developments without public review or comment when those proposed developments meet certain requirements. Sections 76-25-305(4)-(6), -408(7)-(8), MCA (2023 Mont. Laws ch. 500, §§ 22(4)-(6), 29(7)-(8)). Like in *Montana Democratic Party*, MAID challenges the broader language of the statute's provisions as facially defective because it mandates that municipalities limit public participation when approving site-specific developments.

¶32 MAID's facial challenge in this case is distinguishable from the plaintiffs' first claim in *Advocates for School Trust Lands. Advocates*, ¶¶ 26-27; *see also Whalen*, ¶¶ 39-42 (holding defendant's facial and as-applied challenge to the constitutionality of the Sentence Review Division not ripe because the defendant had not subjected himself to the sentence review process and adjudicating the constitutionality would be "pure speculation"). MAID's allegations do not rest on unascertainable, future factual developments that are dependent on pending and discretionary municipal action; rather their claim raises the prospect that "the very enactment of the statute threaten[s] to deprive [the] plaintiff of a constitutional right" because Senate Bill 382's plain language is resolute that the MLUPA municipalities limit the opportunity of public participation for interested citizens during the land-use planning process. *Advocates*, ¶¶ 23, 29. They argue that Senate Bill 382's clear mandate will affect the general and interested citizens' opportunity to participate, and this alone renders this case neither hypothetical nor in need of the development of facts. *See Schoof v. Nesbit*, 2014 MT 6, ¶¶ 17-23, 373 Mont. 226, 316 P.3d 831.

¶33 MAID challenges the constitutionality of Senate Bill 382's statutory language as a question of law in all of its applications. Our adjudication serves to mitigate hardship and inform these and future litigants, the Legislature, and affected municipalities of the viability of future constitutional challenges to the law's public participation provisions as likely to be implemented in July 2027. Insofar as MAID brings a facial challenge to the law, the issue is fit for a judicial decision and therefore ripe for review under both the constitutional and prudential components.

¶34 *2. Do the challenged laws facially violate the public's constitutional right to participate in site-specific land use decisions?*

¶35 The Montana Constitution provides that "[t]he public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law." Mont. Const. art. II, § 8. The basic elements of the constitutional right of participation are notice and reasonable opportunity to be heard. *Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs of Flathead Cnty.*, 2016 MT 256, ¶ 39, 385 Mont. 156, 381 P.3d 555 (*Citizens*). Notice must be "adequate." *Mont. Indep. Living Project v. Mont. Dep't of Trans.*, 2019 MT 298, ¶ 39, 398 Mont. 204, 454 P.3d 1216 (citing *Jones v. Cnty. of Missoula*, 2006 MT 2, ¶ 31, 330 Mont. 205, 127 P.3d 406). Because the right to participate is read coextensively with the right to know under Article II, Section 9, of the Montana Constitution, *Bryan*, ¶ 31, for an opportunity to participate to be reasonable it must comply with the constitutional right to know by allowing for informed participation, *Citizens*, ¶ 39 (quoting *Bryan*, ¶ 44).

21

¶36 The District Court concluded that Senate Bill 382 was unconstitutional because site-specific developments often involve discretionary decisions of significant public interest. The court relied heavily on the statutory frameworks set forth in Title 2, chapter 3, parts 1 and 3, MCA, to reach its conclusion. On appeal, MAID argues that the public has certain, settled expectations for public participation as provided in Title 2, chapter 3, parts 1 and 3, MCA, as well as § 76-3-605, MCA. And these "expectations" necessarily inform the understanding of Article II, Sections 8 and 9, of the Montana Constitution. MAID contends that the MLUPA is unconstitutional because it completely forecloses the public's opportunity to participate at times in the development process when other statutory frameworks have encouraged participation. Amicus Flathead Families for Responsible Growth takes the same position, arguing that the MLUPA does not encourage meaningful public participation.

¶37 The League and Shelter WF posit that the Legislature acted within its authority when it altered the public participation process. The new laws encourage the public to participate during the development of the land use plan and regulations, which ultimately govern the approval of site-specific developments. Amicus APA supports the League and Shelter WF, asserting that public participation is at its most valuable during the initial stages of land use planning and diminishes during the site-specific stage. The APA also notes that the law grants the public de novo appeal for site-specific development approvals.

¶38 Article II, Section 8, of the Montana Constitution is not self-executing. *Jones*, ¶ 53 n.3 (Nelson, J., dissenting in part) (citing *The Right to Participate and the Right to Know in Montana*, 66 Mont. L. Rev. 297, 303 (2005)); *see also Larson v. State*, 2019 MT 28,

¶ 41, 394 Mont. 167, 434 P.3d 241 (interpreting "provided by law" in Article II, Sections 1, 3 and 4, of the Montana Constitution, as the Legislature's constitutional authority to create specific procedures and standards for political candidate elections). The Legislature may "qualify, curtail, or extend its provisions," 16 Am. Jur. 2d. *Constitutional Law* § 104 (2026), so long as it continues to act within its constitutional authority, *Citizens*, ¶ 49.

¶39    Even when constitutional provisions grant the Legislature the authority to develop the contours of the articulated right, "that authority must nevertheless be exercised in compliance with the provisions of the Constitution." *Brown v. Gianforte*, 2021 MT 149, ¶ 24, 404 Mont. 269, 488 P.3d 548; *Bryan*, ¶ 23. The Legislature's implementation of constitutional provisions "will not be elevated over the protections found within the Constitution." *Bryan*, ¶ 23 (citation omitted). As this Court has explained:

> Provisions that directly implicate rights guaranteed to individuals under our Constitution are in a category of their own. That is, although the provision may be non-self-executing, thus requiring initial legislative action, the courts, as final interpreters of the Constitution, have the final "obligation to guard, enforce, and protect every right granted or secured by the Constitution . . . ."

*Brown*, ¶ 23 (citing *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 18, 326 Mont. 304, 109 P.3d 257). Our assessment, though, is limited to whether the Legislature fulfilled its constitutional obligation. We may not dictate the process that the Legislature enacts to implement public participation when it is acting within its constitutional authority. *Citizens*, ¶ 49.

¶40    In *Citizens for a Better Flathead*, the commission adopted a growth policy—similar in some respects to what the MLUPA calls a land use plan—which required that the

23

planning board review the policy every five years and make recommendations on whether the growth policy needed to be updated. *Citizens*, ¶ 3. The planning board followed this directive and began revising the growth policy after the commission's approval. *Citizens*, ¶ 4. The planning board held over twenty public workshops, providing agendas in advance; solicited public comment; allowed for public observations of deliberations; afforded informed opportunities for public participation; and made a final draft available to the public before approval. *Citizens*, ¶¶ 44-47. Citizens nonetheless alleged a violation of the right to participate because of the "complexity of the process and the difficulty . . . in keeping abreast of the specific revisions under consideration and in following the details of the [p]lanning [b]oard's deliberative process." *Citizens*, ¶ 49. We held that the planning board and commission afforded public participation sufficient to pass constitutional muster. *Citizens*, ¶ 49. The commission solicited public comment and "provided the public with a 'reasonable opportunity to submit data, views, or arguments.'" *Citizens*, ¶¶ 43, 49 (quoting § 2-3-111, MCA).

¶41 The Legislature enacted a similar framework in Senate Bill 382. The MLUPA provides for ample public participation throughout the adoption, amendment, and updates of the land use plan, zoning regulations, and subdivision regulations. The plain language is clear that continuous and extensive public participation is encouraged at this stage. The Legislature intended for the MLUPA to cultivate "the broadest and most comprehensive level of collecting data . . . and provid[e] for broad public participation" at the front end of the process when it determined that public participation predominantly should occur during the development of the land use plan and regulations. *See* § 76-25-102(3), MCA.

24

¶42 The District Court and MAID cite *Jones v. County of Missoula* to maintain that non-ministerial agency action of "significant public interest" requires the opportunity for public participation. *Jones*, ¶¶ 16-22. We considered in *Jones* whether Missoula County failed to comply with requirements of Montana's public participation statutes when it did not afford the opportunity for public participation before extending health insurance benefits to domestic partners. *Jones*, ¶¶ 14-16, 22 (discussing §§ 2-3-103, -112, MCA). Here, MAID raises a constitutional argument under Article II, Section 8, of the Montana Constitution, claiming that the MLUPA's extensive public participation process is constitutionally deficient because it does not afford participation at each stage of land-use development. Unlike *Jones*, which concerned a local government's compliance with statutory directives, we consider here whether the MLUPA's separate statutory scheme meets minimum constitutional standards within the Legislature's authority under Article II, Section 8, of the Montana Constitution. *Bryan*, ¶ 23 (citation omitted). "The [C]ourt cannot dictate government agencies administering programs and functions within their authority. Instead, this Court's role is limited to assessing whether the [Legislature] fulfilled its obligations imposed by the Constitution" when it enacted the challenged laws. *Citizens*, ¶ 49. Because the Constitution grants the Legislature the authority to "provid[e] by law" for the public's right to participate, review of MLUPA's facial constitutionality asks only whether the law provides notice and the reasonable opportunity to participate prior to a municipality's final decision.

¶43 MAID points to the fifteen-day limitation on the opportunity to appeal the planning administrator's determinations, noting that in the case of proposed developments that do

not involve subdividing property, the planning administrator's determinations are not required to be made available to the public, though a municipality may choose to do so. Section 76-25-305, MCA (2023 Mont. Laws ch. 500, § 22). This includes permits that are "ministerial" as well as permits that include variances and other deviations. Section 76-25-305(3)-(4), MCA (2023 Mont. Laws ch. 500, § 22(3)-(4)). In the case of subdivision approvals, the planning administrator's determination must be made available to the public. Section 76-25-408(12), MCA (2023 Mont. Laws ch. 500, § 29(12)). MAID observes that in both proposed developments and proposed subdivisions, the MLUPA provides no deadline for when those determinations must be publicly available. Sections 76-25-305, -408, MCA (2023 Mont. Laws ch. 500, §§ 22, 29). Yet, it argues, an aggrieved party is expected to appeal within fifteen business days of the planning administrator's determination and to preserve all issues when doing so. Section 76-25-503, MCA.

¶44 In a facial challenge to these statutes, our review is confined to determining whether the laws fail in all their applications or lack any plainly legitimate sweep. *Hensley*, ¶ 17. It is not plainly illegitimate for the Legislature to put emphasis on public input during the newly required comprehensive land use planning process. The MLUPA calls for local ordinances to further define and implement the application of the statutes and the land use plan.

¶45 The MLUPA makes clear that notice and the reasonable opportunity to be heard must occur prior to making a final decision during the adoption, amendment, and update of the land use plan and regulations; when a site-specific development creates additional impacts not previously considered; and with the opportunity to appeal. Where Senate Bill

26

382 limits public participation on site-specific developments, the public already has participated materially through input during the earlier stages of the comprehensive planning process. Senate Bill 382 also allows for public participation when site-specific developments deviate from the land use plan and regulations to the extent that they produce impacts for which the public has not been given notice and the reasonable opportunity to be heard. And on the other side of the planning administrator's determination, Senate Bill 382 provides two opportunities for de novo review of the administrator's decision. Aside from pointing out the public's "settled expectations" under current law, MAID has not articulated how Article II, Section 8's grant of authority precludes the Legislature from designing a comprehensive land use planning scheme that "provide[s] by law" a specific process for public participation during certain stages of the process. Our construction must favor the MLUPA's constitutionality. *Oberson*, ¶ 14. Because the Legislature has "provided by law" a detailed provision for notice and public participation, we conclude that MAID has not met its heavy burden to show that Senate Bill 382 is unconstitutional in all of its applications.[6]

¶46  *3. Do the challenged land use statutes violate the right to equal protection by irrationally and detrimentally burdening certain classes of citizens?*

---

[6] Though the facial challenge is ripe, whether an ordinance enacted under the MLUPA would provide for sufficient notice and informed participation in these site-specific determinations must await further development. If a case can be made that the local government ordinance or approval process did not provide "adequate" notice to allow informed participation in accordance with the statute, *see Mont. Indep. Living Project*, ¶ 39; *Citizens*, ¶ 39, an as-applied challenge under Article II, Section 8, of the Montana Constitution to a specific situation remains available to a party claiming such a violation. *See Bryan*, ¶¶ 44-45.

¶47 Article II, Section 4, of the Montana Constitution requires that "persons similarly situated with respect to a legitimate governmental purpose of the law receive like treatment." *Gazelka v. St. Peter's Hosp.*, 2018 MT 152, ¶ 15, 392 Mont. 1, 420 P.3d 528 (citation omitted). Our analysis begins with "identify[ing] the classes involved and determin[ing] if they are similarly situated." *Gazelka*, ¶ 15 (citation omitted). Once this is established, we ascertain the proper scrutiny and then apply that scrutiny to the challenged law. *Gazelka*, ¶ 15. If the plaintiff cannot demonstrate that the classes are similarly situated, "then the first criterion for proving an equal protection violation is not met, and it is not necessary for us to analyze the challenge any further." *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192 (citing *Powell v. State Comp. Ins. Fund*, 2000 MT 321, ¶ 22, 302 Mont. 518, 15 P.3d 877).

¶48 The District Court concluded that MAID had not established that the alleged classes were similarly situated. MAID asserts in its cross-appeal that the MLUPA's public participation provisions offer unequal protection because they irrationally limit the citizens' right to participate in the MLUPA municipalities. MAID's second argument alleges that because many Montana cities have neighborhoods subject to private restrictive covenants, the MLUPA arbitrarily places the burden of urban growth on citizens who are not party to a restrictive covenant. MAID adds that the other housing reform statutes that mandate certain cities to allow ADUs and duplexes in single family zones similarly burden homeowners without restrictive covenants.

¶49 We first determine whether a classification exists. *Gazelka*, ¶ 16 (citing *State v. Spina*, 1999 MT 113, ¶ 85, 294 Mont. 367, 982 P.2d 421). Classifications may occur on

28

the face of the law when it "by its own terms classifies persons for different treatment." *Gazelka*, ¶ 16 (quoting *Spina*, ¶ 85). Classification also may occur if a facially neutral law is disparately applied to different groups. *Gazelka*, ¶ 16 (citing *Spina*, ¶ 85). Finally, classification may arise when the statute is facially neutral and evenhandedly applied yet somehow "constitute[s] a device designed to impose different burdens on different classes of persons." *Gazelka*, ¶ 16 (quoting *Spina*, ¶ 85).

¶50 To determine whether classes are similarly situated, the court first must "isolat[e] the factor subject to the allegedly impermissible discrimination . . . ." *Hensley*, ¶ 21. "If the two groups are equivalent in all respects other than the isolated factor," then they may be similarly situated. *Hensley*, ¶ 21 (citing *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 29, 374 Mont. 453, 325 P.3d 1211; *Rausch*, ¶ 18). But identifying an isolated factor alone is insufficient to establish that the classes are similarly situated. *Hensley*, ¶ 21 (citing *MCIA*, ¶¶ 17-18; *Wilkes v. Mont. State Fund*, 2008 MT 29, ¶¶ 19-20, 341 Mont. 292, 177 P.3d 483). A law "does not violate the right to equal protection simply because it benefits [or burdens] a particular class . . . ." *Gazelka*, ¶ 16; *Powell*, ¶ 22. Whether a law creates an impermissible classification between similarly situated classes is determined by the purpose of the challenged law. *Hensley*, ¶ 21 (citing *MCIA*, ¶ 17). If the single isolated factor between the two classes is a "fundamental distinction" that is plainly related to or relevant to the underlying legitimate purpose of the statute, the classes are no longer similarly situated. *Hensley*, ¶ 21 (citing *MCIA*, ¶¶ 17-18; *Wilkes*, ¶¶ 19-20).

¶51 Addressing MAID's first contention, the MLUPA applies only to municipalities "with a population at or exceeding 5,000 located within a county with a population at or

29

exceeding 70,000." Section 76-25-105, MCA. The MLUPA's purpose is to "promote the health, safety, and welfare of the people of Montana through a system of comprehensive planning that balances private property rights and values, public services and infrastructure, the human environment, natural resources, and recreation, and diversified and sustainable economy." Section 76-25-102, MCA. MAID alleges that the two classifications, (1) citizens of the MLUPA municipalities and (2) citizens of the non-MLUPA municipalities, are similar in all respects besides this classification. MAID's assertion that the citizens are alike in all other respects is without support.

¶52 Among other distinguishing features, MLUPA municipalities have different economies, infrastructures, housing needs, and tax bases as compared to less densely populated cities and counties. The Legislature saw a need for comprehensive land use planning in MLUPA municipalities due to their unique circumstances and demands. The Legislature decided that participation was best situated earlier in the land use planning process in the MLUPA municipalities for purposes of streamlining site-specific developments, but also to ensure that development of the comprehensive plan contained the "broadest and most comprehensive level of collecting data . . . [informed by] broad public participation." Section 76-25-102, MCA.

¶53 The Legislature may resolve issues one class at a time. *Geil v. Missoula Irrigation Dist.*, 2002 MT 269, ¶ 48, 312 Mont. 320, 59 P.3d 398. As we have explained:

> [T]he legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The [L]egislature is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. If the law presumably hits the evil where it is most felt, it is not to be

30

> overthrown because there are other instances to which it might have been applied. There is no doctrinaire requirement that the legislation should be couched in all embracing terms.

*Geil*, ¶ 48 (citations omitted; internal quotations omitted).

¶54 MAID fails to explain how this classification is not a "fundamental distinction" relevant to the MLUPA's underlying purpose. The alleged impermissible classification is not wholly unrelated to its objective of balancing all the MLUPA citizens' health, safety, and welfare by developing a process that favors comprehensive data and broad public participation. The Legislature acted within its authority when it extended laws limiting the comprehensive planning processes to MLUPA municipalities, including the role, intensity, and timing of public participation. The classes are not similarly situated because the fundamental distinction between them is relevant to, and the result of, the MLUPA's purpose of fostering more effective comprehensive plans in Montana's more densely populated areas.

¶55 MAID's second equal protection claim alleges that the impermissible classifications are (1) citizens who are party to restrictive covenants and (2) citizens who are not party to restrictive covenants but are governed by local land use laws. "The rights created by restrictive covenants are contract rights." *McKay v. Wilderness Dev., LLC*, 2009 MT 410, ¶ 57, 353 Mont. 471, 221 P.3d 1184 (citation omitted). When neighbors opt to enter restrictive covenants, the parties create enforceable rights based on the "mutuality of burden and the mutuality of benefit as between the [landowners] arising out of the imposition of . . . restrictions . . . ." *Patton v. Madison Cnty.*, 265 Mont. 362, 368-69, 877 P.2d 993, 996-97 (1994); *see also Town & Country Estates Ass'n v. Slater*, 227 Mont. 489,

492, 740 P.2d 668, 671 (1987) ("Each [landowner] is both subjected to the burden and entitled to the benefit of a restrictive covenant.").

¶56 The plaintiffs' equal protection claim in *Gazelka* asserted that the Montana Preferred Provider Agreements Act unlawfully discriminated against uninsured patients and patients whose insurance providers did not negotiate the most favorable preferred provider agreements. *Gazelka*, ¶ 3. This Court held that the classes were not similarly situated because the "insured patients who have contracts with insurers and pay insurance premiums are in completely different positions than uninsured patients who do not have contracts with insurers or pay for the benefits of negotiated, reduced fees." *Gazelka*, ¶ 23. Fundamentally, *Gazelka* held that groups treated differently because of their private contractual affairs are not similarly situated for the purposes of an equal protection claim. *Gazelka*, ¶ 23.

¶57 Like in *Gazelka*, parties subject to a private restrictive covenant have entered a contract to receive a benefit in exchange for a countervailing burden. The benefit is not the consequence of the unequal protections of the law; it is instead the result of a private contract, carrying both enforceable benefits and enforceable burdens. A restrictive covenant creates a classification that cannot, in its essence, be similarly situated to any classification outside of that restrictive covenant when the alleged discriminatory classification is based on the benefits received from entering that contract. Put simply, homeowners without such covenants are not treated differently *because* of the statute. The MLUPA and the other housing reform statutes do not violate the right to equal protection solely because the law treats people not subject to private covenants differently, "as

32

discrimination only exists when people in *similar circumstances* are treated unequally." *Gazelka*, ¶ 16 (citation omitted).

¶58 MAID bore the "burden of proving the statute unconstitutional beyond a reasonable doubt." *Hensley*, ¶ 7. Because MAID does not support its assertion that the MLUPA citizens and the non-MLUPA citizens are similarly situated, MAID has not met its burden on the first equal protection claim. MAID also has not met its burden on its second equal protection claim because it cannot establish that those subject to private covenants are similarly situated to those who are not. Because MAID has not met its initial burden of showing that the classes are similarly situated, our analysis of its equal protection claims ends here. *Rausch*, ¶ 18. The District Court correctly ruled against MAID on this claim.

.   .   .

¶59 Finally, we address Shelter WF's claim that the District Court's ruling on Count I that "[t]he provisions of SB 323, SB 528, SB 425, and SB 382 may not be used by any person or government entity to invalidate or displace covenants that are more restrictive than zoning regulations" was an advisory opinion. MAID does not respond to this argument in its briefing. There was no party before the District Court arguing for the application of or seeking to enforce the new laws against any property of MAID's members subject to restrictive covenants. Though MAID pointed to Noah Poritz's affidavit attesting that he is subject to a covenant more restrictive than the disputed statutes, that covenant is not in the record, and the enforceability of that restrictive covenant was not at issue in the litigation. The District Court did not address Poritz's property, and its broad declaratory judgment, untethered to a specific claim or set of facts, was an advisory opinion. *Plan*

33

*Helena*, ¶ 12 (holding an advisory opinion is "one advising what the law would be upon a hypothetical state of facts or upon an abstract proposition, not one resolving an actual 'case or controversy'" (citation omitted)). We vacate the District Court's declaratory judgment on Count I.

## CONCLUSION

¶60    Finding MAID's challenge justiciable, we conclude that the MLUPA's public participation laws, provided in Senate Bill 382, 2023 Mont. Laws ch. 500, are not facially unconstitutional.  Because MAID failed to establish that the classes were similarly situated, it also failed to establish that the MLUPA and the other housing reform laws violate the right to equal protection.  We vacate the District Court's declaratory judgment on Count I, reverse its summary judgment ruling on Count II, and affirm its summary judgment ruling on Count III.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE